## UNITED STATES, Appellee

v.

## HARKER D. BRUMFIELD, Lieutenant Colonel, U. S. Army, Appellant

### 4 USCMA 404, 15 CMR 404

No. 3797

Decided June 11, 1954

Joe T. Mizell, Jr., Esq., and MAJ Edwin Doran, U. S. Army, for Appellant.

LT COL Paul J. Leahy, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial in Korea upon two charges. Charge I, which consisted of a single specification, alleged a violation of Article 107, Uniform Code of Military Justice, 50 USC § 701, by making five false statements during an official investigation. Charge II alleged violations of Article 121 of the Code, 50 USC § 715. The first specification charged the larceny of several items of property belonging to the United States of a total value of $83.42. The second specification alleged the larceny of fifty pairs of wool trousers, also the property of the United States. The court-martial, by refusing to find the theft of some of the items listed in specification 1 of Charge II, reduced the value of the property taken to $46.84, but otherwise convicted the accused of all other offenses as alleged. He was sentenced to a dismissal and total forfeitures. The convening authority further reduced the value of the property alleged to have

been the subject of the larceny charged under the first specification of the second charge. In addition, on the second specification of that charge he affirmed only the lesser included offense of wrongful appropriation. He approved the findings, as amended, and the sentence. The board of review in the office of The Judge Advocate General of the Army affirmed, and we granted the accused's petition for review. Our grant narrowed the assigned errors to the single issue of the admissibility of a document purporting to be a statement taken from a missing Korean witness. Because of the nature of the issue, we will state the facts which support the findings on all offenses as our ultimate decision rests on prejudice to the accused. The evidence is assembled and related as it applies to the particular crimes.

There are two specifications alleging larceny. The property enumerated in the first specification consisted of two heating stoves, four blankets, and two folding chairs. The court-martial found the theft of only one stove, two blankets and two chairs. The convening authority limited his affirmance to the one stove. The property described in the second specification was fifty pairs of olive drab, wool trousers and we are only concerned with a finding that they were misappropriated. The evidence to support the latter finding is substantially as related: The accused was an officer in Headquarters, Second Logistical Command, Pusan, Korea. On December 8, 1952, accompanied by a captain, he went to a Class II and IV warehouse of the 98th Quartermaster Battalion for the purpose of conducting an inspection of that installation. While there he directed the first warehouseman to furnish him with a bale of trousers. The bale was opened and twenty-five pairs of the trousers were placed in one barracks bag and twenty-five pairs in another. The accused departed with one bag and he directed a captain to take the remaining bag to his quarters. No record was made of the transaction. Later the same afternoon, a warrant officer who was assistant Class II and IV officer, went to the accused's quarters in order to converse

with him about accounting for a shortage in the inventory. The warrant officer was upset as he was responsible for the shortage and the accused assuaged his fears by saying the trousers would be exchanged and others returned. This conversation was at approximately 5:30 p.m. About 7:00 o'clock that same evening, a driver took the accused to a Korean residence, subsequently identified as the living quarters of Hyun Tong Ram, where a barracks bag was removed from the car and taken through the gate to the residence. The driver again saw the accused as he came out of the house at about 10:00 o'clock that same night, but he was not in possession of the barracks bag. Two days later the driver delivered a barracks bag from the residence to the warehouse. Other evidence indicates that fifty pairs of trousers were credited as turned in on that date.

The evidence to support the finding of larceny of the other personal property was substantially this: The driver for the accused testified that sometime in November at the accused's direction, he removed a stove from the accused's office and put it in the trunk of a staff car. That night he drove the accused to the home of Hyun Tong Ram and observed him remove the stove from the trunk of the vehicle and carry it through the gate leading to her residence. The stove was the same type as that subsequently seized when the home of Hyun Tong Ram was searched, and it was identical with those issued by the United States Government. On another occasion the accused expressed a desire to obtain some chairs and he had the driver remove two wooden folding chairs from the salvage area and place them in the trunk compartment of his car. About the time accused assumed command of the Battalion, two white medical department blankets were placed on his bed. Around the latter part of January 1953, a Korean policeman searched the house of Hyun Tong Ram, and two stoves similar to those issued by the United States Army, two folding chairs marked with "USA-QMC" symbols, four white blankets marked "Medical Department," one folding desk, field type, OD Color, one steel

folding cot, and one mattress, were recovered.

In regard to the specification alleging a false official statement, the record reveals that on January 27, 1953, the accused was directed to appear before an inspector general for interrogation regarding a complaint which had been lodged against him. He was advised of his rights under Article 31 of the Uniform Code, 50 USC § 602, and first interviewed by an assistant inspector general. This officer, believing the accused was not telling the truth, requested the inspector general of the command and another assistant inspector general to participate in the interview. During the interrogation, the accused was asked if he had anyone remove olive drab trousers from the Class II and IV warehouse and either deliver them to him or place them in his custody. He replied he had not. A written statement purportedly executed by Hyun Tong Ram in which she asserted that accused had supplied her with certain personal property was read to the accused. He was then asked whether he had seen the property named in the statement on her premises. He stated he had not. The accused was next handed a photograph, was permitted to observe the persons appearing in the picture, and was asked if he had ever associated with the girl who appeared therein. He replied that he had never associated with her. When asked if he recognized the captain in the picture, he denied knowing him. He then was asked if the picture showed he was holding hands with Hyun Tong Ram to which he answered "no."

The captain who was the third party appearing in the picture testified he had known the accused for some six months and he identified the three persons portrayed in the picture as the accused, the Korean girl, who was otherwise identified as Hyun Tong Ram, and himself. He further stated that the picture was taken during a pleasure trip to Chinhae; that the girl had accompanied the accused; and that he had seen the accused with the same Korean woman on previous occasions, but was unable to estimate the number of times. Accused's driver testified he had seen the accused and the woman in each other's company on at least twenty-five occasions and he had driven the accused to her house nearly every night during a two-month period. He identified the woman as being the one appearing in the previously mentioned photograph.

The admission of the statement of the Korean woman shown to the accused poses the only troublesome question in this case. The statement is as follows:

"During the last days of August 1952, I met Lt. Colonel BRUMFIELD in Pusan and I lived with him up until the present time. During this period, I have received as gifts the following articles: approximately five (5) or six (6) hundred thousand Won for monthly living expenses, also the following items: one (1) stove heater four (4) white blankets, one squad stove, two (2) sheets, one (1) pillow case, one (1) folding chair, one (1) coffee table, one (1) radio (civilian), one (1) matress, one (1) folding table, one (1) air pump, five (5) gallon cans filled kerosene. These items are all that I have received from Lt. Col. BRUMFIELD since I met him.

Q. Have you ever received any items of clothing or rations from the Lt. Colonel?
A. No, I have not.
Q. Did Lt. Colonel BRUMFIELD ever bring articles to your home for you to trade or sell for WON?
A. No, he did not."

This was the statement which was exhibited to the accused at the time of his investigation by the inspector general, and it was introduced into evidence under the following circumstances. While the inspector general was on the witness stand, he was handed the statement, which was marked Prosecution Exhibit 1 for identification, and asked if he recognized it. He answered that he did and that the statement had been read to the accused. An objection was lodged to the question, but it was overruled. However, after that the prosecution offered the statement into evidence. An objection was made on the grounds it was hearsay and

**407**

this objection was likewise overruled. The law officer stated it was material for a limited purpose. He then instructed the court-martial that the matters contained in the statement were not to be considered by the court as evidence in the case, that the statement was admitted solely for the purpose of showing it was read to the accused. We are at a loss to understand why it was necessary that the statement be introduced into evidence or read in toto for that or any other reason as the inspector general had already testified to the effect accused had read the contents. However, we must accept the record as we find it and in this instance the complete document was read to the court-martial members.

Government counsel seek to sustain the ruling of the law officer on the ground that the document was not offered for the purpose of proving the truthfulness of the matters asserted therein. They rely on the rules stated by Dean Wigmore. The following quotation from 6 Wigmore, Evidence, 3d ed, § 1766, pages 177–178, is used to support their contention. Therein it is stated:

". . . The essence of the Hearsay rule is the distinction between the testimonial (or assertive) use of human utterances and their non-testimonial use.

"The theory of the Hearsay rule . . . is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the matter asserted,* the Hearsay rule does not apply. The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case; but if it is not received, this is in no way due to the Hearsay rule.

. . . . . .

"The prohibition of the Hearsay rule, then, *does not apply to all words or utterances merely as such.* If this fundamental principle is clearly realized, its application is a comparatively simple matter. The Hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely, as *assertions to evidence the truth of the matter asserted."*

We accept the rule therein announced, but we find it inapplicable in this situation. There was no issue concerning whether Hyun Tong Ram had executed a written document, the nature of its contents or whether it had been read to the accused. Moreover, the contents with one exception were immaterial, and tended to degrade the accused and influence the court-martial adversely toward him. Had the accused made a relevant issue about having read the contents of the purported document executed by her, then its introduction into evidence might possibly be justified for the reason suggested by the law officer. But as the issues were developed, the only possible reason which might justify reference to the document would be to render intelligent one of the questions asked the accused. However, this could have been accomplished without introducing extraneous matters in the record. At the hearing before the inspector general he was permitted to read the communication and then was asked by the inspector general if he had furnished Hyun Tong Ram with the property enumerated in the statement. He denied having done so. The falsity of his answer could have been developed without introducing the written document. Trial counsel needed to go no further than ask the inspector general if the accused had read a document in which personal property consisting of two stoves, four blankets, and two folding chairs were identified. After the inspector general had established that accused had read the document, a question to this effect could have been posed: Was accused asked if he had supplied that particular property to Hyun Tong Ram? When this was answered in the affirmative, accused's reply could have been repeated by the witness. We sug-

gest the foregoing, as one possible method of proving the issue, only to illustrate it was not necessary to parade all the contents of the document before the court-martial to prove properly the one false statement.

The law officer on three separate occasions instructed members of the court-martial they could consider the document only for a possible finding that it was read to the accused. The substance of the three instructions is found in the first ruling on the objection. The law officer there stated "The statement itself is hearsay and it is not admissible. The truth of the statement is of no probative value and will not be considered by the court. It is not hearsay as to the fact the statement itself was read to the Colonel, and it will be admitted on that basis and on that basis only."

Government counsel assert that the court-martial members are presumed to have followed the instructions of the law officer; that they limited their consideration of the document to the purpose stated; and that it was not considered on the merits of guilt or innocence. We have followed that general principle and we so expressed our views in United States v. O'Briski, 2 USCMA 361, 8 CMR 161. Judge Brosman, speaking for the Court, stated:

". . . With the inception of the Uniform Code of Military Justice, trials by general court-martial became in spirit and for all practical purposes, identical with civilian criminal trials by jury. Appropriate, therefore, is the following language of the Court of Appeals for the Second Circuit in United States v. On Lee, supra, 'The jury system is premised on the assumption that when the judge instructs the jury what evidence it may consider it will obey the instruction.' 193 F2d at 310. And the reports contain a host of decisions to the same effect. In conclusion, it is our view that the error relating to the testimony respecting threats—if error it was—was not of such a nature that it might not be cured through instructions by the law officer. Moreover, we firmly believe that —considering the instructions of the law officer here, and placing the challenged testimony in its proper place in the total complex of evidence presented in this voluminous record of trial—there was no fair risk of material prejudice to the accused."

The mere statement of the foregoing rule does not dispose of this case as there is a well-known exception to that principle which embodies the concept that if the inadmissible evidence would probably make such a deep and lasting impression on the minds of the court-martial members, that it could not reasonably be erased by an admonition from the law officer, then accused has been prejudiced substantially. In Mora v. United States, 190 F2d 749 (CA 5th Cir), the principle was set out in this manner:

"As to whether the final charge of the Court to the jury excluding as against Mora the two confessions of Tangney, cured the error in their admission, the long established rule was well stated by the Supreme Court in Throckmorton v. Holt, 180 US 552, 567, 21 S Ct 474, 480, 45 L Ed 663:

'The general rule is that if evidence which may have been taken in the course of a trial be withdrawn from the consideration of the jury by the direction of the presiding judge, that such direction cures any error which may have been committed by its introduction. Pennsylvania Company v. Roy, 102 US (451) 452, 26 L Ed (141) 142; Hopt v. Utah, 120 US 430, 438, 7 S Ct 614, 30 L Ed 708, 711. But yet there may be instances where such a strong impression has been made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission, and in that case the general objection may avail on appeal or writ of error. This was stated by Mr. Justice Field in Hopt v. Utah (supra). And see Waldron v. Waldron, 156 US 361, 383, 15 S Ct 383, 39 L Ed 453, 459.'

• • • • •

"Since there was no substantial evidence against Schmidt apart from the confessions of his co-defendants,

**409**

the conclusion is inescapable that the jury was unwilling or unable to follow the court's belated instruction to disregard those confessions as evidence against Schmidt. We cannot say with fair assurance that the jury was not substantially swayed by the use of Tangney's confessions against Mora. Fiswick v. United States, 329 US 211, 218, 67 S Ct 224, 91 L Ed 196; See Federal Rules of Criminal Procedure, Rule 52(a), 18 USCA."

In connection with assessing prejudice, accused asserts there is no evidence in the record which establishes that the document was in fact executed by Hyun Tong Ram. That might affect its admissibility, but the prejudicial impact on members of the court-martial would not be increased by any deficiencies in that regard. The contents of the document which might have a tendency to inflame the court-martial members against the accused are found in the first paragraph of the statement. Since we seek to determine whether there is any fair risk that the members of the court-martial were swayed adversely to the accused by the statement, we consider the incompetent evidence in a light most unfavorable to him. In that portion of the document the accused is portrayed as having lived with Hyun Tong Ram from the latter part of August 1952, until January 21, 1953, and as having given her money and certain personal property only part of which was included in the specifications. In a close factual case, or one in which the truthfulness or veracity of an accused would require assessment, evidence tending to degrade would undoubtedly require reversal. But here the evidence of guilt on certain specifications is conclusive and on the remaining ones it is compelling. There is no dispute in the evidence and the accused did not testify so the weight to be given his testimony could not have been lessened by attacking his character. As we understand his defense, aside from the presumption of innocence, it was that there was no intent to deceive because when he answered the questions falsely he acted on a belief that a suspectee may deny any fact which tends to connect him with a crime.

When we say the evidence of guilt of some of the offenses was conclusive, we refer to the three false statements which in substance denied that accused was the officer in the photograph; that he knew Captain Wesner, the other officer in the picture; and that he had not associated with Hyun Tong Ram. The court-martial members could not look at the photograph and then observe the accused in court without concluding he lied about his own identity. The same comment can be made about the statement denying acquaintanceship with the Captain, and the picture evidence is fortified by the Captain's testimony that he had known and associated with the accused for six months and accompanied him on a pleasure trip. The picture was taken while the three parties appearing therein were on a personal jaunt, and it alone, without the mass of other evidence, establishes conclusively that the accused associated with the woman.

The evidence as to the other two false official statements is almost as conclusive as that related above. Unless the court-martial members elected to disbelieve the unrebutted and unimpeached testimony of the accused's driver, a warrant officer who was the assistant Class II and IV officer, a captain in the Quartermaster Corps, and a sergeant in charge of the supplies, they had to find the accused directed the removal of trousers from the warehouse. Further, unless the court-martial members refused to believe the evidence given by the driver and the Korean detective, they were compelled to find that the accused had carried some of the property into the house; that the remaining property was on the premises; and that the accused had been present in the home on so many occasions that he would have seen all the property that was reclaimed.

While the foregoing findings would support the sentence, to remove any lingering doubts concerning any probable impact on the other findings, we mention the evidence touching on them. The statement of Hyun Tong Ram enumerated four blankets, two stoves, and one chair, along with other property not covered in the specification. The specification alleged the taking of two

stoves, four blankets and two chairs. The court returned the finding of larceny of one stove, two chairs, and two blankets. The finding as returned by the court-martial is, therefore, not in accordance with the list given by Hyun Tong Ram as limited by the specification, but was based on items which were connected up to the accused by disinterested witnesses. The accused's driver testified to seeing the stove carried by the accused through the gate leading to the house and to having obtained two chairs for him. Two white blankets marked "Medical Department" were traced to his possession by a warrant officer. A stove, two chairs, and two blankets were included in the property recovered by the Korean detective. Those facts and circumstances convinced the court-martial beyond reasonable doubt that the property mentioned in its findings had been stolen by the accused. However, the staff judge advocate to the convening authority concluded that while the circumstances cast suspicion on the accused, there was some doubt about connecting him with taking and furnishing the blankets and the chairs. He, therefore, recommended that the convening authority approve only the theft of the stove. This recommendation was followed and the findings were modified. It might be argued from this that the statement of Hyun Tong Ram influenced the court-martial to return a finding on evidence less than that sufficient to prove beyond a reasonable doubt. We cannot accept the argument. The findings suggest that the court-martial members reached their conclusion not on the basis of the property inventoried in the statement, nor on the property recovered from the house of the Korean woman. Had they been influenced by Hyun Tong Ram's statement, undoubtedly a finding would have been returned consistent with the allegations of the specification as the statement included more than was listed in the charge sheet. Apparently, the factor which influenced the court-martial members to return the finding they did was the testimony of American soldiers which established, aliunde the statement, that the accused was known to have custody of property similar to that recovered and that he had delivered part of the reclaimed items to the woman.

The court-martial returned a finding of larceny of the blankets, but again the staff judge advocate had doubts about the sufficiency of the evidence to show an intent to permanently deprive the Government of its property. The only difference between the two offenses is the intent with which the property was misappropriated; and the convening authority, acting on the advice of his judge advocate, gave the accused the benefit of the doubt and reduced the offense to misappropriation. While we concur with the reduction, reasonable minds might infer different intents from a given set of facts. Moreover, the statement of the Korean woman does not mention any blankets so that if it affected the finding it could only be on the basis that the court-martial was influenced by evidence that accused lived with the Korean woman. It is highly improbable that in view of the entire evidence in this record, the derogatory comments in the statement, which were reasonably inferable from other competent evidence, would cause the court-martial members to differentiate between the intents necessary to establish the different degrees of the crime. Furthermore, the most devastating blow to accused's character and credibility grew out of his own falsities. One who so completely discredits himself can hardly be injured by partially confirmed evidence of the acts of misconduct shown by this record.

Having concluded that there is no reasonable probability that the statement had any measurable impact on the minds of the triers of fact, we affirm the decision of the board of review.

BROSMAN, Judge (concurring):

I am not quite as sure as my brothers appear to be that the law officer in this case exceeded the limits of sound discretion in admitting the challenged statement under the entirely appropriate instructions he furnished.

The nature of the accusations contained in Hyun Tong Ram's statement certainly tended to show that the in-

spector general's investigation—during which original recourse to the paper was had—was distinctly official in character, and one concerned with extremely serious allegations of misconduct against the accused. This indicated, of course, that the latter's statements—alleged to have been false—were made in line of duty. See Manual for Courts-Martial, United States, 1951, paragraph 186.

Too, the accusations contained in the woman's statement tended to reveal beyond peradventure the motive of the accused to conceal the true facts, and thus suggested an intention to deceive. See Manual, op cit. Likewise, presumably, they made the questions asked of the accused by the inspector general, and the former's responses thereto—which latter were alleged to be false—more specific and intelligible.

While the matter might very well have been handled in another, and perhaps safer, manner, and while the law officer might more properly have required the masking of a portion of the questioned document—circumstances which bear critically on the claim of abuse of discretion—I am seriously inclined to believe that the law officer did not follow a completely forbidden route. However, the issue is a close one, and I need not determine it,

for—conceding error on the law officer's part—Judge Latimer has demonstrated amply that it must have been without measurable impact on the minds of court-martial members. Thus—so far as action is concerned—I see no reason to do other than concur outright.

QUINN, Chief Judge (dissenting):

I dissent.

I agree with Judge Latimer that the law officer erred in admitting the statement of Hyun Tong Ram, but I disagree as to the effect of the error. In my opinion, the error resulted in substantial prejudice to the rights of the accused.

The accused did not testify at the trial, and, therefore, his character was not in issue. However, by admitting the statement in evidence, the prosecution was, in essence, permitted to make a substantial attack on the accused's character. Moreover, the statement disclosed the possible commission of a serious offense with which the accused was not charged. See: United States v. Bailey, 12 CMR 564. In my opinion, the law officer's instructions did not effectively eliminate the harmful influence of this improperly admitted matter. Accordingly, I would reverse the findings of guilty and order a new trial.