UNITED STATES, Appellee

v.

JAMES M. GIBSON, JR., Airman Third Class,
U. S. Air Force, Appellant

5 USCMA 699, 18 CMR 323

No. 5418

Decided April 22, 1955

COL A. W. Tolen, USAF, for Appellant.
LT COL Emanuel Lewis, USAF, LT COL Harold Anderson, USAF, and CAPT Giles J. McCarthy, USAF, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused, an airman third class, was convicted by special court-martial of using disrespectful language to a noncommissioned officer and failing to obey a lawful order of a noncommissioned officer in violation of Articles 91 and 92, respectively, Uniform Code of Military Justice, 50 USC §§ 685, 686. With evidence of two previous convictions before it, the court-martial sentenced him to a bad-conduct discharge, confinement at hard labor for six months, and a partial forfeiture of pay for a like period. Although the convening authority approved this action, the officer exercising general court-martial jurisdiction set aside the failure-to-obey conviction and approved the remainder of the findings as well as the sentence adjudged. The board of review affirmed the approved findings, but set aside as illegal three months of the confinement and the forfeiture imposed. We granted the accused's petition for review to determine whether cross-examination as to other offenses was error, and, if so, whether it was prejudicial to his substantial rights.

Although the conviction on the charge of failure to obey was set aside, the nature of the issue in this case is such as to require review of the evidence relating to both charges. In support of the allegations set out in the charge sheet, Master Sergeant Walter C. Anderson, the supervisor of the Air Force mess hall at Elmendorf Air Force Base, Alaska, testified that when he observed the accused enter the mess in "mixed uniform" he ordered him to leave. The accused departed

and returned momentarily after covering the offending portion of his uniform with a field jacket. This ruse was unsuccessful and he was again ordered from the mess hall. Upon receiving this direction, he addressed Sergeant Anderson in the manner set out in the specification of Charge I and turned away. Thereupon, he was ordered to halt and identify himself by giving his name and organization. Rather than comply, he hurried away. This departure forms the basis of the allegations of Charge II. His passion for food, however, proved disastrous for he was apprehended when he entered the mess line for the third time.

The accused was a witness in his own behalf. He limited his testimony to the assertion that if Sergeant Anderson had given him an order, he did not hear it. He made no reference to the offense of disrespect. During the course of cross-examination by trial counsel, a fully qualified lawyer, he was asked whether he had ever been tried by a court-martial. A defense objection to this question was at first sustained but almost immediately overruled when the trial counsel, relying on paragraph 153*b*, Manual for Courts-Martial, United States, 1951, represented that he was attempting to impeach the accused's credibility. Thereafter, the following transpired:

"Q. Have you ever been tried by court-martial?
A. Yes, sir.

"Q. Have you ever been convicted?
A. Yes, sir.

"Q. On what charge?
A. Extra duty, I refused to pull extra duty.

"Q. Was there anything else you were tried for by court-martial?
A. No.

"Q. That's all, refusing to pull extra duty?
A. Yes, sir.

"Q. Weren't you tried for using disrespectful language?
A. —

"Q. Were you tried by court-martial for using disrespectful language?
A. Yes, sir.

"Q. You were. Were you also tried by court-martial for disobeying a lawful order?
A. Yes, sir.

"Q. Along with that you were tried for failure to repair?
A. Yes, sir.

"Q. Is that right?
A. Yes, sir.

"Q. Why did you tell me the only thing you were tried for was failure to repair?
A. Failure to obey an order was part of the same court-martial.

"Q. Why didn't you say you were tried for these other offense at the time?
A. I don't know.

"Q. Were you tried for using disrespectful language?
A. Yes, sir.

"Q. You were tried for that?
A. Yes, sir.

"Q. You admit that?
A. Yes, sir.

"Q. You knew very well you were tried for that offense, didn't you?
A. Yes, sir.

"Q. You lied to me, is that right?
A. I didn't understand—I was tried for it under the same court-martial.

"Q. Under the same court-martial.
A. Yes, sir.

"Q. You admit using disrespectful language and failure to obey a lawful order prior to this time, is that right?
A. Yes, sir.

"TC: I have no further questions. Court have any questions?

"PRES: Can the trial counsel point out to me a definition of moral turpitude as used legally?

"TC: Moral turpitude in some instances is indefinable but moral turpi-

tude refers to those crimes such as larceny, rape, where a certain amount of morality is connected with the offense. For example, for AWOL there is no moral turpitude connected to the offense or for failure to repair; disrespect—there is no moral turpitude connected to that offense but I believe what the court is referring to is the paragraph on 291 which involves moral turpitude affecting credibility. Now he has a prior conviction for a failure to obey a lawful order which would affect his credibility. He was also convicted for using disrespectful language which I feel would also serve to affect his credibility because he disobeyed a command here and, I don't know what the purpose of it was, he used disrespectful language and he has been convicted by prior court-martial for the same offenses."

The defense counsel then renewed his objection requesting that the challenged testimony be stricken. This objection was again overruled. These actions of the president of the court-martial form the basis of the single issue in this case.

Unquestionably, an accused who exercises his right to testify takes his credibility with him to the stand, and it may be assailed by every proper means. United States v. Hubbard, 5 USCMA 525, 18 CMR 149. Neither reason, experience, nor good judgment dictates the pampering of individuals charged with the commission of a crime. With this in mind, a trial counsel should not hesitate to present the Government's competent evidence in its most effective light. Recognizing this, the Manual provides (paragraph 149b (1)):

"An accused person who voluntarily testifies as a witness becomes subject to cross-examination upon the issues concerning which he has testified and upon the question of his credibility. So far as the latitude of the cross-examination is discretionary with the court, a greater lati-

tude may be allowed in his cross-examination than in that of other witnesses."

While a prosecutor may present his case against an accused with vigor and earnestness, the nature of his office imposes upon him some restraint in these areas. As was observed in the United States Supreme Court in Berger v. United States, 295 US 78, 79 L ed 1314, 55 S Ct 629:

". . . But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

Moreover, it must be borne in mind that the rules governing the admission of evidence are based principally upon the logical tendency—or the lack thereof—of certain matters to establish a fact in issue. United States v. Gibson, 3 USCMA 746, 14 CMR 164. Consequently, the use of the word "latitude" in paragraph 149b (1) of the Manual, supra, cannot be construed as a license to authorize trial counsel to completely disregard or willfully ignore well-established rules of evidence. Such conduct, if unchecked, would soon sidetrack the primary objective of the triers of fact, to wit, the ascertainment of the truth. It might also transpose courts-martial from fair and impartial tribunals into forums governed solely by appeals to bias and prejudice.

Among the several permissible methods of impeaching credibility is the use of evidence of previous convictions. In

this particular, the Manual provides (paragraph 153b(2) (b)):

"A witness may be impeached by a showing that he has been convicted by a civil or military court of a crime which involves moral turpitude or is such as otherwise to affect his credibility."

It is quite evident that the offenses by which the prosecution sought to impeach the accused's credibility did not involve moral turpitude. Disrespect and failure to obey are peculiarly military offenses, with no exact or approximate counterparts either in the moral or civil order under ordinary rules of interpretation. Moreover, the penalties provided for them by the Table of Maximum Punishments are insufficient to raise them to the level of felonies. See United States v. Moore, 5 USCMA 687, 18 CMR 311. Finally, we perceive in the misdeeds, referred to in the cross-examination, nothing tending to create an inference that the accused is unworthy of belief, nor has appellate Government counsel attempted to urge this facet of the rule to justify the receipt of the questioned evidence. They argue that paragraph 149b of the Manual, supra, permits inquiry into acts of misconduct broader in scope than that permitted by paragraph 153b(2)(b), supra. In view of the conclusion hereinafter reached, our reply to this need not be extended. That portion of the Manual provides:

". . . On the question of his credibility and within the limits imposed by the privilege against self-incrimination a witness may be cross-examined as to any matter touching upon his worthiness of belief (unless the court in its discretion decides that the relationship of the particular matter to the credibility of the witness is too remote) his relation to the parties and to the subject matter of the case, his interest, motives, and inclinations, his way of life, affiliations, associations, acts of misconduct, habits, and prejudices, his means of obtaining a correct and certain knowledge of the facts about which he testifies and the manner in which he has used those means, his powers of discernment, memory and description, and his physical defects, infirmities, and mental idiosyncrasies. He may be asked in a proper case whether he has expressed animosity toward the accused, or whether, on a specified occasion, he made a statement materially different from that embraced in his testimony."

Each of the permissive inquiries itemized in the foregoing quotation are directed by their very nature to the *credibility* of a witness, not to his capacity for wrongdoing. Consequently, although there appears to be some conflict between the two Manual provisions, as far as previous convictions are concerned, the restrictions of paragraph 153b(2)(b), supra, are not relaxed by those of paragraph 149b. Both make it clear, that the "conviction" or "acts of misconduct" must involve moral turpitude or be such "as otherwise to affect his credibility." In this connection, we declared in United States v. Long, 2 USCMA 60, 6 CMR 60:

". . . Every departure from the norm of human behavior may not be shown on the pretext that it affects credibility."

Concerning the offenses here involved, it may be observed that one so unbridled in speech and conduct is considerably less likely to lie than one whose conduct is more controlled. For these reasons, the evidence of the previous convictions was inadmissible, and the defense objection was erroneously overruled. But this did not end the matter at the trial level, nor does it conclude our consideration of the issue.

With the complete record before him, it is obvious that the president of the court had strong misgivings as to the admissibility of the previous convictions for he called upon the trial counsel to explain the term "moral turpitude." Sensing the loss of his advantage, the

**703**

prosecutor suddenly shifted his ground. His reply to the inquiry was an invitation to the court to misappropriate evidence originally received for impeachment purposes and apply it as proof of the accused's guilt. This invitation proved acceptable for it terminated all further discussion. Lest it be thought that this statement of the prosecutor was a mere inadvertent slip of the tongue during the heat of trial, we note that in his final argument he repeated his insistence upon the court's improper consideration of these evidentiary items. The ground advanced by the trial counsel on this occasion emphasized the very evil another basic rule of evidence is designed to avoid. This rule is set out in the Manual in the following terms (paragraph 138*g*):

> "The general rule is that evidence that the accused has committed other offenses or acts of misconduct is not admissible as tending to prove his guilt, for ordinarily such evidence would be useful only for the purpose of raising an inference that the accused has a disposition to do acts of the kind committed or criminal acts in general and, if the disposition thus inferred was to be made the basis for an inference that he did the act charged, the rule forbidding the drawing of an inference of guilt from evidence of the bad moral character of the accused would apply."

Discussing the logic underlying this rule, H. C. Underhill in his "Criminal Evidence," 4th ed, section 180, says:

> "The large majority of persons of average intelligence are untrained in logical methods of thinking, and are therefore prone to draw illogical and incorrect inferences, and conclusions without adequate foundation . . . [Jurors] will very naturally believe that a person is guilty of the crime with which he is charged if it is proved to their satisfaction that he has committed a similar offense, or any offense of an equally heinous character. And it can not be said

**704**

with truth that this tendency is wholly without reason or justification, as every person can bear testimony from his or her experience, that a man who will commit one crime is very liable subsequently to commit another of the same description. To guard against this evil, and at the same time to avoid the delay which would be incident to an indefinite multiplication of issues, the general rule . . . forbids the introduction of evidence which will show, or tend to show, that the accused has committed any crime wholly independent of that offense for which he is on trial."

We have referred to this rule on numerous occasions and have emphasized its relationship to the requirements of a fair trial. United States v. Yerger, 1 USCMA 288, 3 CMR 22; United States v. Perna, 1 USCMA 438, 4 CMR 30; United States v. Valencia, 1 USCMA 415, 4 CMR 7; United States v. Jones, 2 USCMA 80, 6 CMR 80; United States v. Long, 2 USCMA 60, 6 CMR 60; United States v. Johnson, 3 USCMA 447, 13 CMR 3. Evidence received for impeachment purposes cannot be twisted into affirmative proof of guilt without doing violence to this fundamental precept. Stephens v. State, 252 Ala 183, 40 So2d 90; People v. Granillo, 140 Cal App 707, 36 P2d 206.

The admission of this evidence was labeled error by the officer exercising general court-martial jurisdiction, for the offenses which it disclosed did not involve moral turpitude. However, that official sought to limit its prejudicial effect to the offense of failure to obey, observing that the evidence relating to the disrespect charge was "uncontradicted."

Of course, error without prejudice is no ground for reversal. But we cannot agree that the effect of this error may be isolated to a single offense. Specific reference to *both* offenses was made by the trial counsel; the crimes involved were the identical offenses

charged; the error is a particularly flagrant one, persisted in at all important junctures of the proceedings; and, because of its very nature, was calculated to produce a wrongful conviction. Nor do we agree that "uncontradicted" evidence is the equivalent of "compelling" evidence. To take such a view requires us to ignore the effect of a plea of not guilty, the presumption of innocence, and the right of an accused— supported by a constitutional guarantee—to remain silent as to any offense charged. We can hardly view matters of such paramount importance quite so lightly.

Finally, the description of the accused's language by Sergeant Anderson was corroborated by but a single witness. This individual's ability to observe and to hear the incident was seriously impaired by the general noise of a busy mess hall and by his distance from the scene. Under all the circumstances, the Government's case was not so overpowering as to reduce the error to the inconsequential variety. Pierce v. United States, 86 F2d 949 (CA6th Cir).

The decision of the board of review is reversed and a rehearing, or other action not inconsistent with this opinion, is ordered.

Judge BROSMAN concurs.

LATIMER, Judge (dissenting):

I dissent.

This case involves previous convictions of a nature similar to those charged in the present specifications, and it is argued the evidence influenced the court-martial to find that the accused committed these offenses because he has a disposition to disobey orders and use obscene language. For my purposes I concede that error was committed, but I reject the argument on prejudice for reasons which will be hereinafter set forth.

My associates say "error without prejudice is no ground for reversal." That is just a rephrasing of Article 59(b) of the Code, 50 USC § 646, and

I believe it announces a principle which requires a result contrary to the one ordered. I need not give consideration to any impact on the sentence imposed, as the extract copies of the service record showing the prior convictions were properly introduced after findings, and the court-martial was at liberty to consider them in assessing punishment. The prejudicial effect of the evidence, therefore, must be limited to its effect on the findings.

In a disputed factual case, or when the evidence of the Government fails to compel a finding of guilt, or where the truthfulness or veracity of an accused on a given specification must be assessed, incompetent evidence placed before the court-martial for the purpose of diminishing his worthiness of belief would require reversal. But here we are not faced with any of those possibilities. The conviction on one specification alleging failure to obey was disapproved, and the evidence of guilt on the other charging disrespect is simply overwhelming. There is no dispute in the facts on the latter offense, as the accused elected to testify on one charge, but chose not to contest the evidence on the one with which we are concerned. He in no way pitted his credibility against the worthiness of belief of the Government's witnesses, and so the court was not required to determine which of two conflicting stories was furnished by the more trustworthy witness.

The principal witness against the accused was Master Sergeant Anderson, the person toward whom the disrespectful language was directed. According to the sergeant, the accused was two to four feet away from, and face to face with, him at the time the odious language was used. There is no merit to any contention that Anderson could have misunderstood either the words used or the manner in which they were spoken. Furthermore, it is a fair inference that the accused was motivated by some feelings of hostility toward the sergeant. He corroborates the testimony that he appeared out of uniform;

that he was challenged by the sergeant who he claims used the following language—"Wait a minute, boy, what do you have under your jacket?"; and that he believed he could enter the mess hall in a mixed uniform. Moreover, when he was directed to change into proper garb, he failed to do so. Instead, he attempted to gain entrance to the mess hall on the second occasion by concealing the fact that he was not correctly attired. When the sergeant stopped him for a second time, he became belligerent and the foul and obscene language was uttered so that it could be heard by Airman First Class Haller. The latter testified to the precise language which he heard the accused use, and I find it more than coincidental that he recounted much of the exact verbiage testified to by the sergeant. Airman Haller was not more than four or five feet away from the parties at the time this incident occurred, and although the majority seems to suggest otherwise, Haller testified that there was not a lot of noise in the mess hall. Even had there been, he established without any doubt that the exchange of words was in a tone loud enough to be heard by him.

The holding of the court is inexplicable to me for the obvious reason that a mass of incriminating evidence is not weakened by the presence of one iota of countervailing testimony. In addition, it is not undercut by inconsistencies or uncertainties or by casting doubt on its source. Here, not only is the record barren of testimony to meet the prosecution's case, but defense counsel is unable to point to any inconsistencies, uncertainties, or improbabilities in the testimony of either Anderson or Haller, or to suggest any reason why they would be prejudiced or biased against the accused. No motivation for falsification or distortion of the truth by these two witnesses may be found within this record of trial. Neither had known the accused before the difficulty arose, and Haller particularly had no interest in the outcome.

In reaching my conclusion, I have not overlooked the possible contention that this incompetent evidence of previous convictions might undermine the presumption of innocence. This is, in my opinion, the only possible ground upon which the majority opinion might rest. But here the facts are so overwhelmingly against the accused that that idea is whimsical. What dissipated the presumption in this case was the clear, direct, and positive testimony of the Government witnesses, unchallenged by facts, fancy, or inferences. To take a contrary view, one would be required to believe that the incompetent evidence, in some degree, influenced the court-martial to find against the accused. To test that possibility, I ask, could any reasonable person have reached a finding other than guilt in the absence of the error found here by the majority? My negative answer requires me to affirm the decision of the board of review.