UNITED STATES, Appellee

v.

WILLIAM SLOAN GANDY, First Lieutenant, U. S. Army, Appellant

5 USCMA 761, 19 CMR 57

762

No. 5403

Decided May 6, 1955

Julius J. Novack, ESQ., and LT COL Harley A. Lanning, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, LT COL Thomas J. Newton, U. S. Army, and 1ST LT Elliott H. Eisman, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

On October 25, 1953, the accused in this case was arrested by civilian officials in Barstow, California, for the unlawful possession of marihuana. He was turned over to military officials for trial, and thereafter a general court-martial found him guilty of that offense in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. The court imposed a sentence of dismissal from the service, total forfeitures, and confinement at hard labor for three years. The convening authority reduced the confinement to one year and six months but otherwise affirmed. A board of review in the office of The Judge Advocate General of the Army affirmed the conviction and sentence, and we granted the petition for review in this Court in order to pass upon the propriety of one question asked the accused on cross-examination.

## II

Even in its better aspects, this case presents what appears to be either the conviction of an indiscreet officer for the wrong offense, or an abortive attempt on his part to shift responsibility for the possession of marihuana to an enlisted man who, in the end, refused to be the scapegoat. While there was a great deal of confusion about some of the ultimate facts to be found by the court, the evidence of the Government clearly establishes the following. The accused was an Army medical doctor with the rank of First Lieutenant who was assigned to temporary duty with the Station Hospital in Camp Irwin, California. On Sunday afternoon, October 25, 1953, he, accompanied by Corporal Motley and Corporal Reed, drove from Camp Irwin to Barstow in the accused's Packard automobile. In the course of a number of stops at restaurants, bars, and questionable addresses, they picked up a narcotics peddler named Perez and were proceeding toward a given destination in Barstow when they happened onto a dead end street. They were followed by a police car containing two Barstow City police officers and a military policeman who, because of the presence of Perez and the peculiar activities of the parties, had concluded that the persons in the vehicle were trafficking in narcotics. Acting on what appeared to be reasonable grounds, the police officers stopped the car, ordered the occupants to dismount, and searched the persons and the vehicle. Prior to dismounting, the accused and Perez were occupying the rear seat of the vehicle. The arresting officers noticed Perez attempt to secrete something near where he was seated, and two marihuana cigarettes were later found stuffed between the cushion and the back or side of that seat. The arresting officers asked Motley, who was driving, for the registration card for the vehicle, but he informed them it was not his automobile and he could not produce the desired certificate. The accused admitted ownership, moved in to the front seat, opened the glove compartment, noticed a bottle of vodka, handed it out to

Reed, looked around for his driver's license, and then slid out the left side. The front seat was divided, and three marihuana cigarettes thereafter were found stuffed in the space separating the driver's seat from the passenger's seat. When the accused was ordered to place his hands on the top of the automobile so that a search of his person could be made, one of the police officers noticed him making a movement with his right arm. What appeared to be an object, or objects, was, or were, seen to drop from the right side of the accused's person to the ground near his feet. The officer flashed his light to the ground as the falling objects made contact, and they turned out to be brownish colored cigarettes which contained marihuana. Subsequently, the accused's car was thoroughly searched and over 100 marihuana seeds were found in hidden places, particularly under the door kickplates which were removed by the officers.

As part of its case in chief, the Government introduced in evidence certain pretrial statements of the accused made within a day or two after his apprehension. One consisted of an admission made to the Chief of Police of Barstow on the night of the arrest in the presence of one of the apprehending officers that he, Gandy, had dropped the cigarettes. The second statement was a complete written statement given to Agent Burdick of the Criminal Investigation Detachment on October 26, 1953, in which accused included an assertion that Corporal Reed had borrowed $5.00 from him to purchase marihuana cigarettes.

## III

The accused testified in his own behalf, and his evidence was inconsistent, not readily believable and anything but convincing. After relating his activities immediately before the incident involved, he continued with the following version: As the four riders were proceeding along the city streets prior to the apprehension, Motley was driving. Reed was sitting in the front seat, and Perez and the accused were in the back seat. He

offered various versions of his money transactions with Reed, but in general he contended that on the day before the incident Reed had importuned him for the loan of five dollars and that sometime during the ride he handed forward what he believed to be a five dollar bill to Reed. Someone took it, but he could not be sure whether it was Reed, who was sitting in the front seat, or Perez, who was sitting to his right. He fell asleep, but a short time thereafter Reed again asked him about the loan of $5.00. At that time, he noticed Perez reach down in his pocket and bring out a bag, empty its contents, throw the bag out of the window, and say something to Reed about "six for five or five for five." Accused then for the first time became suspicious that Reed and Perez were talking about marihuana, so he cautioned Reed, "Don't use that stuff around me to get high on." He then handed a bottle of vodka to Reed, and at that time he noticed five cigarettes in Reed's hand. He seized two of them and threw them out of the window. This incident happened before the car came to a stop. At about that time, someone in the car stated there was a police car in the vicinity. Motley drove a short distance and stopped, but the accused urged him to continue on as he did not believe the police were seeking to apprehend them. However, the policemen came over, ordered the occupants out of the vehicle, and searched the car and the passengers.

In contradiction of the prosecution testimony, on direct examination he testified that he did not tell Agent Burdick he gave Reed $5.00 to buy marihuana cigarettes; that he did not tell the police officers he had dropped the marihuana cigarettes to the ground while he was outside the car; that he did not touch or handle any cigarettes except when he grabbed the two from Reed's hand and threw them out the window; and that at that time he didn't know but he thought the cigarettes contained marihuana.

On cross-examination, he was asked concerning the contents of the previously mentioned written statement which he gave to Agent Burdick on October 26, 1953. He admitted most but denied having made some of the assertions contained therein, particularly those which tended to show his knowledge of the presence of marihuana in his automobile. He contended that the information about his knowledge of the presence of narcotics was placed in the written statement unknown to him. While he signed the statement, he did not read it carefully, and the inaccurate portions were improperly inserted by the agent. Parenthetically, this latter contention is gravely impaired by his initialing of at least three changes in the statement. Furthermore, he placed in dispute the statements of three other officers that he had admitted knowing the money was for the purchase of marihuana.

In explaining his alleged conversations and writing, the accused gradually shifted the time of his acquisition of knowledge from a point early in his travels to after his incarceration. He first claimed that he became suspicious of his passengers' traffic in marihuana before they went to Raquel's Cafe, when the conversation concerned itself with a "loose or rolled" subject. He then moved the time when his suspicions were aroused to an incident which occurred after leaving Raquel's and just before the apprehension when he heard the "six for five or five for five" colloquy. Finally, he asserted he did not know that marihuana was the subject of discussion until after his arrest when he had time to reflect on the many incidents. He then concluded that marihuana cigarettes had changed hands in his automobile, but he had not given Reed any money to purchase them.

IV

Trial counsel, in attempting to impeach the accused, used the following tactics. He first asked the accused if on direct examination he had not stated that he, the accused, did not know the money was to be used by Reed to purchase marihuana. When accused answered in the affirmative, trial counsel asked about the state-

ment concerning the loaning of the money to Reed to buy the narcotic, as set out in his written statement to Burdick. The accused denied that he had made any such statement. Accused was then asked whether he had made any other statement to the agent about his knowledge of the purpose for the loan. He testified he could not remember but subsequently qualified that assertion by a recitation of a conversation which he contended he had with the agent. That particular version varied in some details from his other testimony, and he was again asked whether he had made any other statement to Burdick. After replying in the negative, accused was specifically asked this question:

"Q. Now listen carefully and tell me if I am repeating this correct. On the 26th of October when you talked to Mr. Burdick, didn't you say Reed wanted to borrow $5.00 from you, you knew at that time it was for marihuana but you said okay because you thought Reed might expose your homo-sexuality?
A. No, I didn't.
Q. You did not make that statement?
A. I did not."

Defense counsel at that point objected by stating that unless trial counsel had evidence that accused had made such a statement, he had committed prejudicial error. The prosecutor then made it clear that his only purpose in asking the question was to impeach the testimony of the accused by showing a prior inconsistent statement and that he proposed to prove the statement by another witness. It was to determine the propriety of the foregoing question that we granted the petition in this case.

V

Because we will later discuss the impact of the alleged error, it becomes necessary to mention one other character in this drama. He is Corporal Reed, who accompanied the accused on the fateful journey. When he was interviewed after the apprehension, he, too, made a statement to

**766**

Agent Burdick. In that statement, which was taken on October 27, 1953, the second day after the apprehension, he stated in substance that he asked Lieutenant Gandy for the loan of $5.00 with which to buy marihuana from Perez; that he did not obtain the money at the time of his first request, but it was subsequently given to Perez after the sale and purchase of five marihuana cigarettes for $5.00 had been agreed upon; that Lieutenant Gandy was to furnish the money; that he must have given it direct to Perez as it was not given to Reed; and that Lieutenant Gandy knew they were dealing with marihuana. Reed was not used as a witness for the Government on its case in chief, but after the defense had rested, he was called in rebuttal. It then developed that the day before he appeared, through the medium of his counsel, he had been granted immunity from prosecution conditioned upon his agreement to testify in this case. His version from the witness stand was entirely different from that contained in his pretrial statement, and if he was telling the truth while testifying at trial, the reasons for his inconsistencies will be readily understandable. According to his testimony from the witness chair, at the time the parties were incarcerated in jail Lieutenant Gandy instructed him on what evidence he was to furnish. He attempted to follow the instructions when giving his statement to the agent because the accused had led him to believe that, unless he did so, the accused would appear as a witness against him at Reed's trial and that an officer's word was better than an enlisted man's. Furthermore, he claimed that accused violated his promise to him that if Reed would accept responsibility, the accused would employ and pay for the services of a lawyer. Reed further testified that sometime thereafter, the accused was acting as medical officer of the day, and Reed required medical attention. He went to accused's office for the treatment, and while there he was handed a typewritten statement of what Gandy expected Reed to state when called as a witness. The accused asked him to read the statement and

determine if he liked the proposed version. Reed answered in the negative because it tended to place too much responsibility on him. However, he took the typewritten document with him and retained it in his custody until the time of this trial. It was identified properly and introduced as an exhibit to establish an attempted subornation of perjury by the accused. The net effect of the statement was to disassociate accused from the furnishing of the consideration for the purchase of the cigarettes.

From the mass of inconsistent and contradictory testimony outlined above, we are faced with a determination of two issues. First, was it error for the trial counsel to state, in full, the inconsistent statement purportedly made by the accused when counsel was laying the foundation for an impeachment question? Second, if it was error, did it have any measurable impact on the court-martial members? We treat the issues in the order stated.

## VI

As a general proposition of law, a defendant testifying in his own behalf is subject to the same cross-examination as is any other witness. He, too, may be cross-examined about his statements out of court if they are in any way material and conflict with his testimony given in court. Inconsistent statements are a well-recognized method of impeaching the credibility of a witness, but before they may be used, a proper foundation must be laid in order to permit a witness to explain, deny, or admit them. To lay the predicate, the witness must first be confronted with the impeaching statement, quoted as accurately as possible, so that he will be afforded a fair opportunity to make an honest and intelligent answer and a reasonable explanation. If that is not done, the witness is placed in an unfair position. A judge in a civilian court, and a law officer in a military court, have some discretion as to the completeness and substantive content necessary to lay the proper foundation. When dealing with a verbal statement, it is the better practice to give the time, the date, the place, the person to whom the statement was made, and a verbatim account of the statement, if possible. If it is not possible to quote, word for word, the statement as given, then it is a satisfactory substitute to give the substance and effect of the statement claimed to have been made. In this instance, trial counsel gave the full substance of the purported prior statement. Can it then be said that because the accused, in his admission, had mentioned an undesirable trait of character, trial counsel was duty bound to delete the self-deprecating portion of the statement? As a general proposition, we can say it might be advisable to delete degrading information if the statement is divisible and the debasing portion is of little materiality. However, as previously indicated, we are operating in an area of some discretion. Much will depend on the demeanor and attitude of the witness and the possibility of prejudice flowing from an unnecessary reference to his own admission of defects in character. Assuming, arguendo, that as a general rule a prior statement should be policed before being repeated, a witness who is contumacious, quibbles, hedges, does not remember, or is apt to seize on an omission of part of the statement as a basis for denial, cannot raise error if the cross-examiner is more exact in quoting the base for his impeachment questions. In this instance, the accused had denied his written statement and at least one other oral statement heard by three officers. Each time he explained his answers, he varied his version of what he had stated to the third parties, and he categorically denied having made more than one statement to Burdick. The cross-examiner was, therefore, entitled to pin him down to the precise language used in the particular statement. Moreover, trial counsel was seeking to establish a second and separate statement to the agent, and the only difference in phraseology

that would identify the second statement from the first and prevent the question from becoming repetitious and confusing was contained in the phrase which mentioned homosexuality. An incomplete predicate under those circumstances might render the question objectionable and the answer of little or no value. That alone would authorize the inclusion of the questioned phrase.

There is yet another reason why it may be argued that trial counsel had to relate the full substance of the previous statement. One accused of committing an offense sometimes has a desire to justify his incriminating conduct, even though he understands that he may remain silent, and here this accused knew he did not have to say anything. He had, however, previously admitted being a prime actor in making it possible for an enlisted man to traffic in narcotics, and apparently he wanted to justify his acts by contending that Reed knew of his sexual tendencies, a sort of suggestion that he only became involved in the sale because Reed held a sword of knowledge of homosexual tendencies over his head. In the light of that, it is inferable that the statement was meant to be exculpatory in that it disclosed an unwilling participation with an enlisted man in drug traffic. If it could be viewed in that light, trial counsel was under a duty to include the beneficial portion of the statement when he posed his question. He ought not to quote the damaging portion and leave that which was explanatory and self-serving out of his question. Therefore, we conclude that the question was not improper even though it tended to disclose a character defect involving moral turpitude. The fact that it included some information which, under other circumstances, might be viewed as inadmissible, does not forbid its use here.

### VII

It has been argued that because trial counsel did not establish that the accused made the statement, counsel, without good cause, injected an unfavorable inference into the case for the sole purpose of prejudicing the accused. That is just not so. It is to be noted that accused's negative answer remains unrebutted, and the prosecution was, therefore, bound by that answer. The law officer had limited the impeachment questions to their legitimate sphere, and defense counsel could have requested him to inform the court that accused's negative answer must be taken as true. Failing in that regard, he cannot now contend that the law officer erred in failing to deal further with any harmful inference possibly arising from the question. Moreover, we believe the record will affirmatively establish that trial counsel asked the question based upon reasonable grounds, and that he desisted from going further in his proof out of a superabundance of caution. When challenged by defending attorney, he asserted that he would prove the making of a statement. When defending counsel objected to that statement, the law officer entered the colloquy, and the record shows the following questions and answers:

"MR. NOVACK: If the court please, if he has a statement as to fact he should offer it, otherwise I submit that the counsel is guilty of misconduct in asking a question of that kind in the presence of the gentlemen of the court.

"LO: The objection is not sustained.

"TC: May I make a statement, sir; I propose to substantiate that with another witness.

"MR. NOVACK: I object to that again, your Honor, and request you instruct the gentlemen of the court to disregard that statement, and assign it as misconduct.

"LO: The request of the defense counsel is denied; however, I think at this time the trial counsel should indicate his line of questioning at this time in the proceedings.

"TC: Yes. I am at this time endeavoring to impeach the witness by showing prior inconsistent statements made to Mr. Burdick, the CID Agent, who has testified here today.

"LO: You say this impeachment

proceedings is as to what he testified here today?

"TC: I said Mr. Burdick, the man who testified here today.

"LO: Well, as I see it, you have some other means of impeaching this witness by prior inconsistent statements other than what was given by Mr. Burdick here today before the court?

"TC: Yes, by other statements made to Mr. Burdick.

"LO: Proceed."

The discussion is unclear as to the content the law officer intended to put into his last remarks, but apparently trial counsel concluded that he had been given an admonition to impeach without exaggerating the character disorder. He recalled Mr. Burdick and other witnesses and questioned them about the other pretrial statements made by accused but did not mention the one which contained the reference to the homosexual tendencies. We are, therefore, led to believe that he concluded not to probe further into the matter because of the cautionary remark of the law officer.

If, as trial counsel stated, he could prove the prior inconsistent statement, the accused was not prejudiced by that omission. The court was required to accept the accused's denial, and the matter was reopened, not by trial counsel as he never again mentioned the subject, but by defending counsel, who was not content to let the subject stay buried. On the contrary, in his closing arguments, and we assume not improperly, he made capital out of the omission, for he told the court the following which is quoted from his final argument:

". . . That is all I am asking you to do, is to apply the law to the facts, free of prejudice of any kind, type or nature, bearing in mind that there has been an accusation made by counsel—pointed out and asked a question. He promised to connect it up but not one iota of evidence has he shown in his promise to Colonel Dixon that he would connect up this reference to homo-sexuality. You recall that, gentlemen. All forgot-

ten about, but yet it was mentioned, and in my mind it was mentioned in an attempt to prejudice you gentlemen. When you hear that word it prejudices anyone. Where has counsel—and I am not trying him—I am trying to try this case on the facts—where did he connect that up on his promise as an officer of this court? He did not, and I hope that you, as gentlemen of this court, will disregard that because you are duty bound to disregard it. There has been no evidence of any kind except mention made of it by the trial counsel."

VIII

For the purpose of disposing of the second issue of prejudice, we will assume that trial counsel erred in posing the question. That forces consideration of whether the error would have had any measurable impact on the minds of the members of the court. Conceding, arguendo, that the very mention of the word has a tendency to impeach the credibility of a witness, there are cases where an accused so impairs his own veracity that further damage is not possible. This is one of those cases. It is not necessary to repeat many of the evidentiary items which have been previously mentioned. We only need measure the damaging effect of accused's own in-court contradictory testimony, and his attempt to influence Reed to testify falsely, against the overwhelming weight of the evidence produced by the Government, to establish that all reasonable men would be compelled to return a finding of guilty. There are certain matters which are either admitted or undisputed. There can be no question but that seven marihuana cigarettes were found inside accused's automobile. Two were discovered close to where he was positioned after alighting. A large number of marihuana seeds were found in places which clearly establish that the car had been previously used for hauling that narcotic. The accused admits possession of two cigarettes, however only momentarily. Of course, his story that he threw them out of the window

borders on the incredible if his other testimony is believable. According to his version, the car was moving at the time he grabbed the cigarettes and tossed them out of the car. It might be possible, but hardly probable, that two cigarettes would be so directed by the wind that they would be found together at the feet of a dismounted passenger at some distance from the point of throwing. The movement of the car and the air currents would have a tendency to prevent that from happening. Moreover, his numerous inconsistent stories, his admitted knowledge of the presence of narcotics, and his participation with enlisted men in trafficking narcotics, all cast a serious reflection upon his character for truth and veracity. His damaging admissions, fortified by his inconsistent attempts to escape their effect, were established by three Barstow City police officers, a Criminal Investigation Detachment officer, and a Major Riley who was present during the taking of accused's statement by the civilian police as an observer but was in no way connected with the investigation of the case, and his veracity suffered immeasurably when pitted against theirs. In addition, his testimony, if it raised any defense, was so improbable as to be entitled to little, if any, credence. Another devastating circumstance was the almost inescapable conclusion that he sought to have an enlisted man commit perjury to prevent his own conviction. We need not bottom our arguments in this connection on the testimony of Reed, who, too, may have been an unreliable witness. While the accused on his cross-examination claimed he had never seen the typed exhibit containing the proposed testimony, it was shown that Reed was in the stockade during the entire period of time, had no access to a typewriter, and Reed and the accused are the only two persons with a motive to falsify on the particular subject matter. Furthermore, that this was a false story concocted by the accused appears with certainty from the record and the exhibit itself. On all previous occasions, he had contended that he had three twenty dollar bills, or a total of $60.00,

in his possession at the time of the incident, and he loaned Reed $5.00. When his money was returned to him upon his release from incarceration, he receipted for $59.00. In the prepared statement, to which Reed was to adhere while testifying, is a significant item which was to corroborate an account of the money transaction, known only by the accused and advanced as his last version while he was on the witness stand. It is phrased in the first person and to be fully understood, the "I" must be considered as referring to Gandy. "When I [Gandy] got nack (sic) to the car I mistook a one dollar bill for a five and that Motley took the one dollar bill which I owed him because he thogh (sic) I was paying him. I thought I was giving Reed the five dollar bill." Had anyone so testified, it would have assisted the accused in escaping the logical inferences arising from his act of furnishing the money to purchase the cigarettes. Of course, both Gandy and Reed were on record that $5.00 was the amount of the loan and that Gandy was the financier. In light of new developments, a change had to be made. We merely suggest the question: Who of the four passengers, other than Gandy, could better his case by advancing that new theory?

We are urged by his counsel that the case of United States v. Provoo, 215 F 2d 531 (CA2d Cir), presents a situation comparable to the one with which we deal. We have every reason to accept the rationale of that case, but we do not propose to equate a molehill to a mountain. A cursory reading of the facts of that case will disclose that homosexuality was made a matter of prime importance. More than 200 pages of the transcript were devoted to its development. It was referred to and argued as being admissible only because of the tendency to destroy the credibility of the accused. What in that case was inadmissible evidence framing an issue of tremendous importance is, in this case, evidence assumed by us to be inadmissible for purposes of argument, of such insignificance as to be unnoticeable in the

overall evidential structure. In measuring the impact of any error, consideration must be given to the setting in which it is made. In that instance, it had, as the Circuit Court of Appeals found, a profound and powerful impact on the minds of the jurors. We suggest that in this case the impact, if it can be said there was any, was so slight as to be illusionary, and the deprecating effect of the phrase, in all probability, would have been nonexistent, had it not been for defending counsel's attempt to profit because his adversary failed to rebut the negative answer of the accused.

The decision of the board of review is affirmed.

Judge BROSMAN concurs.

QUINN, Chief Judge (dissenting):

I dissent.

I dissent because I cannot subscribe to the conclusion reached by the majority or to the reasoning on which it is predicated.

Every court requires a prosecuting officer to exercise discriminating restraint in the presentation of evidence against an accused. He must scrupulously refrain from the use of improper methods designed to produce a wrongful conviction, because the average juror is certain that no prosecuting officer would use illegal means to obtain a conviction. Berger v. United States, 295 US 78, 79 L ed 1314, 55 S Ct 629. That **Headnote 5** trial counsel violated his duty in this instance is established beyond doubt. The statement he sought to attribute to the accused was inadmissible for *all* purposes, for whatever its capacity to impeach may have been, it was designed to show the commission of an offense not charged in direct violation of paragraph 138*g*, Manual for Courts-Martial, United States, 1951; United States v. Gibson, 5 USCMA 699, 18 CMR 323.

Moreover, the crime suggested by the question was not a run-of-the-mill violation, nor a mere "undesirable trait of character" as denominated by the majority. The prosecutor very clearly implied that the accused customarily indulged in detestable crimes against nature. The mere suggestion of such an offense is calculated to inflame the passions of the court, and is likely to overcome the presumption of innocence.

Finally, the majority argue that the alleged statement to Agent Burdick was meant to be exculpatory; that trial counsel was under an obligation to "include the beneficial portion of the statement when he posed the question." A clearer case of "killing with kindness" can hardly be imagined. Our civilization has not yet become so decadent that our judicial tribunals will accept an admission of homosexuality as beneficial to the maker under any circumstances. When it is proposed as an explanation for assisting in the traffic of marihuana, it is like amputating a patient's arm to remove a splinter from his finger.

In Beck v. United States, 33 F2d 107 (CA8th Cir) the court said:

". . . A trial in the United States court is a serious effort to ascertain the truth; atmosphere should not displace evidence; passion and prejudice are not aids in ascertaining the truth, and studied efforts to arouse them cannot be countenanced; the ascertainment of the truth, to the end that the law may be fearlessly enforced, without fear or favor, and that all men shall have a fair trial, is of greater value to society than a record of convictions."

There is in the record of this trial no such clear and convincing evidence of guilt, as would justify dismissing the serious misconduct of trial counsel, as inconsequential. I would, therefore, reverse the findings of guilty and order a rehearing. See my dissent in United States v. Brumfield, 4 USCMA 404, 412, 15 CMR 404.