UNITED STATES, Appellee
v.
EDWARD B. FREEMAN, Private E-2, and GERMAN EMERSON, JR., Private E-2, U. S. Army, Appellants

4 USCMA 76, 15 CMR 76

No. 3211

Decided March 26, 1954

LT COL George M. Thorpe, U. S. Army, for Appellants.

LT COL William R. Ward, U. S. Army, and 1ST LT Joseph C. Chandler, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused were tried by general court-martial in Germany upon two charges alleging violations of the Uniform Code of Military Justice. The two specifications under Charge I alleged the joint rape of Hedwig Jaeger and of Marianne Jacklo in violation of Article 120, 50 USC § 714. Charge II and the specification thereunder alleged an assault with a dangerous weapon upon Helmut Jaeger contrary to the provisions of Article 128, 50 USC § 722. Both accused were found guilty as charged and sentenced to death. The convening authority approved both the findings and sentence. A board of review in the office of The Judge Advocate General of the Army reduced the finding of guilty of the charge alleged under Specification 2 of Charge I to joint assault with intent to commit rape upon Marianne Jacklo in violation of Article 134, 50 USC § 728. The death sentence was affirmed by the board, but its members forwarded to The Judge Advocate General a recommendation that the sentence as to each accused be commutted to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for life. The case is before this Court on mandatory review under Article 67(b)(1) of the Code, 50 USC § 654.

For obvious reasons we relate generally the facts of these atrocious crimes. Dr. Helmut Jaeger and Dr. Hedwig Jaeger, husband and wife, are both medical doctors living in Hohenlinden, Germany. Marianne Jacklo was employed by them as a cook, and resided in their home. At 12:45 a.m. on October 21, 1952, the two accused rang the doorbell at the Jaeger residence. Dr. Helmut Jaeger, thinking that someone was in need of professional assistance from him, went to the door where he was confronted by the two accused. One of them was bent over and holding his stomach. The other explained that his friend was ill and requested medical assistance for him. When the doctor returned with the medicine, and while he was taking the cellophane wrapping from the pills he had obtained, he was struck with a terrific blow on the left side of his head. He remembered hearing the splintering of glass and before losing consciousness, he saw the neck of a broken bottle in a black hand. He further recalled being struck with fists and kicked with the feet of the accused.

Upon hearing a horrifying scream

from her husband, Dr. Hedwig Jaeger ran to the treatment room clad only in her nightgown. She saw her husband lying on the floor in a pool of blood. The sight which confronted her caused her to scream for help. Emerson, one of the accused, struck her on the jaw, threw her to the floor of the hall, knocked her unconscious and commenced to rape her. She regained consciousness while he was raping her and saw her seven-year-old daughter, who witnessed the whole affair, standing in the corner of the hall screaming. While she was on the floor being raped, the accused, Freeman, who had proceeded to the children's room, opened the door several times to say something to Emerson. Mrs. Jaeger called to Marianne Jacklo for help but the latter replied from the children's room that she was unable to give any assistance.

Marianne Jacklo, the maid, was also awakened by the cries of Dr. Helmut Jaeger. She proceeded into the hall and saw the doctor on the floor in the treatment room. She also saw one of the accused grab Mrs. Jaeger. Marianne returned to her room, locked the door, and started to open the window in order to escape and obtain assistance. Freeman broke down the door, grabbed her and dragged her across the hall into the children's room, where he threw her upon a bed, and proceeded to rape her.

About this time, Dr. Helmut Jaeger regained consciousness and heard the screams of his wife, Marianne, and his daughter. The door from the treatment room into the hall was partly opened; he closed and locked it, climbed through a window, proceeded to a neighbor's house, and then to a police station to summon help. He later returned to his house where his wife treated him for injuries and put him to bed. He suffered a concussion of the brain, three cuts on and about his ear, a broken wrist, a large hematoma on his arm and shanks, and damage to the vision in his right eye. Aside from injuries in the vaginal area, Mrs. Jaeger suffered a hematoma on her left lower jaw, injuries to the inside of her mouth and tongue caused by biting herself, skin injuries, and two broken teeth. The maid was more fortunate as she only encountered contusions and abrasions.

All three of the victims testified that neither of the accused appeared to be intoxicated, although there was evidence introduced which indicated the accused had been drinking before the crimes were committed.

As their first assignment of error, the accused contend that the board of review, after reducing the finding of guilty under Specification 2 of Charge I to a lesser included noncapital offense, erred in failing either to grant a new trial or to set aside the death penalty and impose a sentence of imprisonment for life or a term of years. In order to determine whether error was committed by the board, we must examine the provisions of the Code from which those agencies receive their power and authority. Article 59(b), Uniform Code of Military Justice, 50 USC § 646, is applicable to all reviewing agencies. It provides as follows:

"Any reviewing authority with the power to approve or affirm a finding of guilty may approve or affirm, instead, so much of the finding as includes a lesser included offense."

Clearly, the above provision empowered the board to take the action it did in reducing the finding of guilty of rape to one of assault with intent to commit rape. However, reductive action on the sentence is not mandatory. Article 66 (c), 50 USC § 653, in referring to the action which boards may take upon the sentence, provides as follows:

"In a case referred to it, the board of review shall act only with respect to the findings and sentence as approved by the convening authority. It shall affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved."

Under the above-quoted provision, the board was not required either to change the sentence or order a new trial. As a matter of law, it could not do the former. The death penalty was

adjudged by the court-martial, and the offense alleged in the first specification would support that finding. When the board of review affirmed that finding, the sentence was legal. An attempt to reduce the sentence would have necessarily resulted in a commutation of sentence. Congress has not granted that power to boards of review. Cf. United States v. Bigger, 2 USCMA 297, 8 CMR 97.

At best the board had three possible alternatives. First, it could affirm the sentence as originally imposed; second, it could affirm the sentence and recommend that clemency action be exercised by those in whom such authority was vested; and third, it could direct a rehearing, if sentence could not be justified reasonably upon the affirmed findings. We think the board was correct in its decision to reject the third alternative. The facts we have previously related show that the offenses committed by the accused were of a violent and heinous nature. The offenses were established beyond peradventure of doubt, and there is not the slightest semblance of a defense suggested. The record justifies the sentence imposed, and, in view of all the circumstances, we fail to discern any merit to the contention that the facts should be relitigated.

The board of review could have affirmed the sentence and included no recommendation for clemency. Undoubtedly the members of the board of review found some reason to be lenient and, having no authority to commute, chose to make such a recommendation to other authorities possessing such power. Since the recommendation is favorable to the accused, they have no cause to complain. As we read the record, they were indeed fortunate to receive any consideration. For the reasons stated, the first assignment of error is overruled.

The accused next contend that the law officer committed prejudicial error in refusing to give an instruction on the extent of resistance in the words requested by defense counsel. At the conclusion of the trial, the law officer submitted his proposed charge to the court-martial and asked if there were any requests for further instructions. Defense counsel replied that there was one minor additional request which they submitted to the officer. The request was denied, and this ruling is assigned as the error. In his instruction on the offense the law officer advised the court members that in order to convict the accused of the alleged offense they must find that they "acting jointly and in pursuance of a common intent, had sexual intercourse with a certain female not the wife of either accused . . . and that the act was done by force and without her consent." The instruction requested by defense counsel is as follows:

"It is necessary to prove (in such case) that the defendant intended to complete his purpose in defiance of all resistance."

The requested instruction is one sentence taken from Wharton, Criminal Law, 12th ed, § 701. Torn from its context, the sentence presents a variation from the rule of law therein announced. The entire section reads as follows:

"Acquiescence through fear not consent. Consent, however reluctant, negatives rape; but where the woman is insensible through fright, or where she ceases resistance under fear of death or other great harm (such fear being gaged by her own capacity), the consummated act is rape. Thus, where a father by his ferocity establishes 'a reign of terror' in his family, and under this power his daughter remains passive while he has carnal intercourse with her, this intercourse, effected by terror, and without consent, is rape. Nor is it necessary that there should be force enough to create 'reasonable apprehension of death.' But it is necessary to prove in such case that the defendant intended to complete his purpose in defiance of all resistance.

• • • • • •

"While the degree of resistance is an incident by which consent can be determined, it is not in law necessary to show that the woman opposed all

the resistance in her power, if her resistance was honest, and was the utmost, according to her lights, that she could offer."

Viewed in its entirety, the section states a proposition of law with which we do not disagree; but the principle of importance therein announced is not applicable in this instance. There is no issue of acquiescence by the victims. On the contrary, they resisted to the bitter end. Aside from that, in the extracted form, the instruction does not state the law correctly. For our purposes, in this case, the general rule is that rape is accomplished when the act of sexual intercourse is committed by force and without the consent of the victim. Paragraph 199a, page 355, Manual for Courts-Martial, United States, 1951; Wharton, supra, § 700. Although the circumstances by which lack of consent can be shown may vary, we can hardly visualize a factual situation in which that element could be more firmly established than is found in this record. To require an instruction that the court-martial must find the accused intended to complete his purpose in defiance of all resistance, might permit an accused to escape the consequences of his wrong because the victim might have deterred him had she done more.

We need not concern ourselves with any showing of acquiescence or consent. Here, both victims of the offenses had witnessed the results of the accused's brutal attack upon Dr. Helmut Jaeger. There was a child of tender years in the house who was placed in danger by the conduct of accused. The husband needed care and medical attention for his injuries. Both victims were brutally beaten. One was knocked unconscious, and the other was forcibly dragged from one room to the other. The whole atmosphere was one of violence and brutality. The court-martial members were told that they must find lack of consent, and our recitation of facts is adequate to show that such a finding was compelled. Accordingly, we find no error in the law officer's refusal to give the requested instruction.

It is next contended that the law officer erred in improperly limiting defense counsel's cross-examination of Dr. Helmut Jaeger. On direct examination Dr. Jaeger had testified that the accused did not appear to be intoxicated and that they had struck him with a bottle which was kept on his premises. During the course of the cross-examination, defense counsel attempted to impeach his credibility by asking two questions: (1) "Did you make the statement which appeared in the German press: 'The soldiers were absolutely sober'?" (2) "Did you ever make a statement that one of these soldiers had knocked you down with a bottle that he had kept hidden?" The substance of the reported statement was to the effect that the accused were intoxicated at the time. Trial counsel registered an objection to the questions on the ground that a proper foundation had not been established. The Doctor was permitted to testify that he had not stated the men were intoxicated, but the law officer sustained the objections to the quoted statements. He, however, notified defense counsel that if he would fix the approximate date of, the place where, and persons to whom, the prior inconsistent statements had been made, he would overrule the objection. Immediately thereafter, a five-minute recess was taken and after trial resumed, defense counsel pursued the subject no further.

It is axiomatic that the issue of the credibility of a witness is a proper subject for cross-examination, and his credibility may be impeached by showing that he has previously made statements which are inconsistent with the testimony given by him at trial. In order to confine the examination within reasonable limits and to protect the character of the witness from an unfair attack, it is necessary for counsel to lay a proper foundation for impeachment. The language of the Manual which prescribes the method by which this should be done is as follows:

"A witness may be impeached by showing by any competent evidence that he made a statement (or engaged in other conduct) inconsistent with his testimony,

but a foundation must first be laid before introducing evidence of an inconsistent statement. The foundation for the introduction of evidence of the making of an inconsistent oral statement is laid by asking the witness if he made the inconsistent statement, at the same time directing his attention to the time and place of the statement and the person or persons to whom it was made." [Paragraph 153*b* (1) (*c*).]

We shall assume that both questions suggested prior inconsistent statements and were, as contended ▮▮▮▮▮ ▮ for by defense counsel, asked for impeaching purposes only. All the law officer did was to suggest to defense counsel the proper way to proceed, but the suggestion was not accepted. Apparently defense counsel could not establish a sufficient predicate to qualify the questions as, after the recess, he abandoned this line of questioning. Because of the sentence imposed in this case, we have scrutinized the record with care and we can find no reason to disagree with the ruling. It was in accordance with the Manual and, if defense counsel had information suggesting the possibility of inconsistent statements, the ruling placed no unusual burden on him as it would have been relatively easy to supply the information necessary to meet the rule.

Lastly, it is contended that the evidence is insufficient to establish that each appellant was an aider and abettor to the other and engaged in a joint venture in the commission of the rapes. Appellate defense counsel argues that the two offenses committed upon Frau Jaeger and Fraulein Jacklo are separate and distinct and there is no showing that there was any concert of action by the two accused. It is conceded that the accused, Freeman, did not have intercourse with Frau Jaeger; and likewise, the accused, Emerson, did not carnally know Fraulein Jacklo. Their joint guilt of the two offenses, therefore, must be predicated upon the theory that each aided and abetted the other. Article 77 of the Code, 50 USC § 671, provides that "Any person . . . who commits an offense punishable by this code, or aids, abets, counsels, commands, or procures its commission . . . is a principal." In defining the Code provision, the Manual provides as follows (paragraph 156, Manual for Courts-Martial, United States, 1951):

"To constitute one an aider and abettor under this article, and hence liable as a principal, mere presence at the scene is not enough; there must be an intent to aid or encourage the persons who commit the crime. The aider and abettor must share the criminal intent or purpose of the perpetrator. If there is a concert of purpose to do a given criminal act, and such act is done by one of the parties, all probable results that could be expected from the act are chargeable to all parties concerned; but in order to make one liable as a principal in such a case, the offense committed must be one embraced by the common venture or an offense likely to result as a natural or probable consequence of the offense directly intended."

We have previously enunciated the rule as to what we believe constitutes a principal within the meaning of the above provisions. United States v. Jacobs, 1 USCMA 209, 2 CMR 115, dealt with the provisions in effect prior to the Code, but since they were retained in the latter substantially unchanged, the rationale of that opinion is apropos in this instance. We stated:

"Inactive presence during the commission of an offense is clearly an insufficient link to guilt. The aider and abettor must share the criminal intent or purpose of the active perpetrator of the crime, and must by his presence aid, encourage, or incite the major actor to commit it. Morei v. United States, 127 F2d 827, 831, (CA 6th Cir). See Manual for Courts-Martial, United States, 1951, paragraph 156. The proof must show that the aider or abettor did in some sort associate himself with the venture, that he participated in it as in something he wished to bring about, that he sought by his action to make it successful. Learned Hand, J., in United States v. Peoni, 100 F2d 401, 402 (CA 2d Cir). The standard of

**83**

relationship to the offense by which conviction as an aider and abettor must be measured, therefore, lies somewhat between proof of participation as a paramount agent, on the one hand, and speculative inference based on mere presence at the scene of the crime, on the other, and is made definite by the requirement of evidence of specific intent."

In the case at bar the record overwhelmingly shows a concert of action, and a mere restatement of ■ a few facts will answer the argument that each was not associated with both offenses. The accused, by a ruse in which both participated, gained entrance to the home of a German National after midnight. They each knew there were female occupants of the house to further their purpose. Both contributed to a brutal assault on the male member of the household. After the assault victim had been rendered unconscious, both accused proceeded to rape the female members of the household whose attention and presence were occasioned by the beating administered to Dr. Jaeger. Freeman observed Emerson raping Frau Jaeger and his action in peering through the door and carrying on some conversation suggests the character of a lookout. The entire course of conduct, from the ruse until departure from the house, shows a plan to gratify their sexual desires deliberately conceived, brutally carried out, and jointly participated in by both. The members of the court-martial, under proper instructions, found each of the accused guilty; and we fail to see how they could have done otherwise.

The decision of the board of review is affirmed.

Judge BROSMAN concurs.

Chief Judge QUINN concurs in the result.