UNITED STATES, Appellee

v

ROBERT J. GRADY, Recruit, U. S. Army, Appellant

13 USCMA 242, 32 CMR 242

No. 15,752

August 3, 1962

First Lieutenant Thomas Stapleton argued the cause for Appellant, Accused. With him on the brief was Captain Ralph T. Smith.

First Lieutenant Carl F. Wrench argued the cause for Appellee, United States. With him on the brief was Major Francis M. Cooper.

KILDAY, Judge:

## I

An Army general court-martial convened by the commander of the 7th Infantry Division, in Korea, found accused guilty, contrary to his pleas, of one specification each of arson, robbery, and attempted arson, in violation of Articles 126, 122, and 80, respectively, of the Uniform Code of Military Justice, 10 USC §§ 926, 922 and 880. In each specification it was alleged that accused Grady had acted in conjunction with two other men—Privates First Class Cameron and Hobbs. After a pre-sentence hearing, the court-martial sentenced accused to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for nine years. In accordance with the recommendation of his staff judge advocate, the convening authority approved the finding of guilty of robbery, but set aside accused's convictions for arson and attempted arson. He approved only so much of the sentence as provided for dishonorable discharge, total forfeitures, and confinement at hard labor for two years. Thereafter, a board of review in the office of The Judge Advocate General of the Army affirmed the findings and sentence, as modified.

Upon his appeal to this Court, we granted accused's petition for review to consider whether the law officer erred in:

1. Allowing reference to homosexuality on the part of Grady and his principal witness;

2. Failing to instruct the court-martial to disregard references to homosexuality; and

3. Instructing the court that said references could be considered on the issue of credibility.

We also elected to hear arguments on:

4. Whether the corroboration of the accomplice witness is sufficient to support a conviction; and

5. Whether the alleged threat to his witness, Hobbs, prejudiced the right of accused to a fair trial.

## II

At the time of accused Grady's trial, both Cameron and Hobbs—with whom he was alleged to have acted in conjunction—had been convicted of all three offenses, but review by the convening authority had not been completed in their cases. The Government produced Pfc Cameron as a witness. He testified to all of the elements necessary to convict the present appellant of all three specifications against him. Upon cross-examination, however, Cameron admitted he had previously made sworn inconsistent statements exculpating Grady.

The appellant produced Pfc Hobbs as a witness in his behalf. Hobbs exonerated Grady as to the two specifications subsequently dismissed, and did not testify as to the remaining one. The Government was permitted to elicit from Hobbs information as to homosexual acts with appellant. Objection was made to the admission thereof as being inadmissible for impeachment purposes; that it brought out a crime for which the appellant was not on trial and was highly prejudicial to his rights. The law officer admitted the same on the question of credibility and overruled the objection.

The defense witness Hobbs also testified that trial counsel had told him, shortly before he took the witness stand, that, if he testified in Grady's behalf, his own then outstanding sentence to eight years' confinement would not be cut; however, if he did not give evidence as a witness, there was a chance it might be reduced to four years.

Such other facts as are pertinent to our inquiries will be set out in the course of the treatment of the issues.

## III

The question of sexual deviation is present in a rather peculiar setting in this record. After the defense witness Hobbs had been questioned with ref-

erence to such conduct between himself and appellant, defense counsel, having recalled the Government accomplice witness Cameron, asked him whether he had ever had any homosexual relations with the accused. Cameron refused to answer under the provisions of Article 31, Uniform Code of Military Justice, 10 USC § 831, on the grounds that his answer might tend to incriminate him, and he made the same response to a question as to whether he ever had homosexual relations with the defense witness Hobbs. Thus, after the law officer overruled its objection, the defense sought to inquire into the same area with regard to the prosecution's principal witness. Nevertheless, our initial inquiry must be whether the law officer erred in refusing to foreclose the Government from eliciting, from Hobbs, evidence as to this sort of repulsive activity between him and accused.

Reference to the authorities indicates that cross-examination of a witness as to his relationship with ██ the accused is permissible ██ even though such relationship be illicit. And such inquires, bearing as they do on bias, motive, and prejudice, are not restricted as going to collateral matters. Thus, in 98 CJS, Witnesses, § 548, the rule is summarized in this language:

"The existence of immoral relations between a witness and the party for whom such witness was called may be shown as a circumstance affecting the credibility of the witness."

See also 58 Am Jur, Witnesses, § 720.

To like effect is the following statement of the rule, quoted from 3 Wharton, Criminal Evidence, 12th ed, § 879:

"It is proper to cross-examine the accused's witness as to his relations with the defendant, as bearing upon his bias, motives, and general credibility. A witness may be cross-examined as to his or her relations with the accused, whether business, social, sexual, or otherwise."

And it is further stated in section 881 of the same treatise:

"A witness may be asked on cross-

examination any question that affects his credibility, even though it tends to disgrace or disparage him."

Along the same line is this comment in an annotation on the subject at 27 ALR 278:

"It appears to be well established that for the purpose of showing bias a witness in a criminal prosecution is properly subject to cross-examination concerning any illicit relations with the defendant."

So, too, in Underhill, a Treatise on the Law of Criminal Evidence, 5th ed, § 246, we read the following with regard to liberality in the manner of proof of bias:

"The bias of the witness and his interest in the event of the prosecution are not collateral, and may always be proved to enable the jury to estimate his credibility. They may be proved by his own testimony upon cross-examination or by independent evidence, and, while much latitude is allowed, the extent of such cross-examination rests very much in the sound discretion of the court."

Particularly apposite to the question here before us is the decision of the United States Court of Appeals for the District of Columbia in Ewing v United States, 135 F2d 633 (1942). There Justice Rutledge—later Associate Justice of the Supreme Court of the United States—wrote:

". . . a witness may be cross-examined as to facts tending to show bias for or against a party, or his willingness to be unscrupulous in giving testimony, for impeachment purposes; that bias may be shown by extrajudicial statements of the witness from which an inference as to his feelings toward a party may be drawn and by extrinsic evidence independently of cross-examination; and that the witness may be contradicted, if he denies having made such a statement." [135 F 2d at page 640.]

See also Gordon v United States, 344 US 414, 97 L ed 447, 73 S Ct 369 (1953); Tla-Koo-Yel-Lee v United States, 167 US 274, 42 L ed 166, 17 S Ct 855

(1897); Spaeth v United States, 232 F 2d 776 (CA 6th Cir) (1956); Bram v United States, 226 F 2d 858 (CA 8th Cir) (1955); McFarland v United States, 174 F 2d 538 (CA DC Cir) (1949); Meeks v United States, 163 F 2d 598 (CA 9th Cir) (1947); Murray v United States, 247 Fed 874 (CA 4th Cir) (1917)—cited in the annotation, 27 ALR, supra; Motley v Alabama, 207 Ala 640, 93 So 508, 27 ALR 276 (1922); Daywood v State, 157 Tex Crim 266, 248 SW 2d 479 (1952); Crist v State, 21 Tex App 361, 17 SW 260 (1886)—also cited in the ALR annotation, supra; Manual for Courts-Martial, United States, 1951, paragraphs 153b(2)(d) and 149b. Cf. Brown v State, 168 Tex Crim 67, 323 SW2d 954 (1959), in a case involving only misdemeanors.

Nor are we persuaded that—as a matter of law—evidence of this character *must* be barred because proof of an illicit relationship shows reprehensible conduct that could possibly be inflammatory. To bind the hands of a law officer with a flat prohibition would be to place a premium on illicit relations directly proportional to the gravity thereof. Further, in that connection it should be borne in mind that, in many instances, the more reprehensible the association, the greater is the bias and motive of the witness to color his testimony. Obviously, rulings on such matters fall in a discretionary area.

We therefore conclude it was not error to permit the cross-examination of the witness Hobbs as to an illicit relationship with the appellant, nor was it error to fail to instruct the court to disregard such references.

The references to an illicit relationship between Hobbs and appellant were admissible for the purposes stated by trial counsel, and sustained by the law officer, "Sir, this bears heavily on the issue of [the witness'] credibility, bias, motive, prejudice in this case." In that connection we note that in an out-of-court hearing defense counsel requested the law officer to admonish the members of the court-martial that evidence accused might be guilty of a crime not charged should not be con-sidered as going toward guilt of the offenses for which he was on trial, and trial counsel agreed such an instruction was appropriate. The law officer concurred, properly charging the court members on the limited purpose for which such evidence was admitted and that it could not be considered as evidence on any issue involved in the case, and the defense expressed satisfaction with the instruction given.

Further, we deem it appropriate to point out that the defense examined the witness Hobbs only as to the specifications alleging arson and attempted arson, and not regarding the charge of robbery. The convening authority, as we have heretofore noted, disap-proved the findings of guilty as to those two specifications involving arson, and accused stands convicted only of robbery. Moreover, defense counsel at the trial revealed to the law officer that he was informed, before he offered Hobbs as a witness, of the existence of the references to homosexuality. It appears, therefore, that the defense was not surprised, but assumed the calculated risk that the importance of the evidence to be offered by Hobbs justified the risk of proof as to the illicit relationship between him and the appellant.

In any event, and in line with the authorities cited, we hold that the assignments numbered 1, 2, and 3 herein, must be resolved adversely to petitioner.

IV

As to the assignment dealing with corroboration of an accomplice, the law officer fully and properly instructed the court on accomplice testimony and the necessity for corroboration. See Manual for Courts-Martial, United States, 1951, paragraph 153a; United States v Bennington, 12 USCMA 565, 31 CMR 151. After careful examination of the entire record we are convinced of the sufficiency of the evidence to support the conviction. The testimony of the accomplice witness Cameron was not self-contradictory, uncertain or improbable. While there was evidence of prior inconsistent state-

245

ments by him, this issue was properly submitted to the court-martial by the law officer in his instructions.

Additionally, there is direct evidence in the record, as well as very strong circumstantial evidence, corroborating the accomplice witness. We regard all of the evidence, when taken and considered together, sufficient to support the findings. Thus, we find this assignment lacking in merit and overrule the same.

## V

We turn, then, to the issue which concerns alleged intimidation of the defense witness Hobbs. As ▉ we have noted earlier, he asserted that trial counsel threatened him if he testified in accused's behalf. We must observe that, if there was any threat or other attempt to intimidate Hobbs, it did not prejudice the appellant, for Hobbs did appear as a witness for Grady and, in his testimony, fully and completely exculpated appellant of the two specifications as to which he testified. The findings of guilty as to those two offenses, incidentally, were disapproved by the convening authority and are not before us.

We would not condone any action by trial counsel which deprives an accused before a court-martial of the benefit of testimony in his behalf. However, this question is not submitted to us. The record fails to reflect that the witness was in anywise inhibited. Hobbs took the witness stand under oath, and testified fully and in complete exoneration of the appellant. We are not called upon to determine what the situation might be if the alleged threat had caused Hobbs to refuse to testify.

Nor is that the only reason for deciding this issue against the accused. In explaining the alleged threat, Hobbs testified that he was charged, in conjunction with our present appellant and the witness Cameron, for the offenses here involved; that he had been tried by court-martial for those offenses; and that he had been convicted and sentenced, *inter alia,* to dishonorable discharge and confinement at hard labor for eight years. The affidavit of the

trial counsel who prosecuted the instant petitioner has been presented to this Court. In it he denies having attempted to influence Hobbs to do anything other than tell the truth. He acknowledges having spoken to Hobbs and in effect said to him that he could testify as he pleased, but should, however, bear in mind that the convening authority would probably be less inclined to reduce his eight-year sentence if he became a perjurer. Further, he avers that he told Hobbs he had heard the latter's eight-year sentence would probably be reduced to four years; and that he offered to bring Hobbs' lawyer to him if he desired, but that Hobbs declined. We note parenthetically that the records of this Court indicate that the confinement portion of Hobbs' sentence was reduced by the convening authority to three years. United States v Hobbs, CM 406370, docket number 15,773, pet den April 2, 1962.

Trial counsel is an officer of the Army and is certified under Article 27(b), Uniform Code of Military Justice, 10 USC § 827, as professionally qualified. Therefore he has successfully stood the screening required in both capacities. We find no comparable certification for the veracity of Hobbs. Even were such a question properly presented for our determination, we would hardly be justified, on the basis of this record, in resolving an issue of fact between the two men in favor of Hobbs.

But apart from that, we agree with the position taken by defense counsel in his argument to the court-martial that, rather than weakening the testimony of Hobbs, the same was strengthened by the alleged incident. The defense made much over the fact that Hobbs had every reason to have testified to the contrary and in accordance with the alleged desires of trial counsel, because he had been convicted of the offenses involved and sentenced to eight years; his case was still pending approval of the convening authority; and trial counsel had made a statement to Hobbs which the latter could consider as an offer from a person with apparent authority to make it, to cut the sentence in half. Notwithstanding, defense counsel urged, Hobbs had "stuck his own

neck out. He took the chance of spending his full sentence in jail, rather than come into court and lie to you."

We believe the trial strategy of defense counsel to have merit. No doubt such was his purpose in developing the conversation between Hobbs and trial counsel. He asked for no relief and claimed no prejudice by reason of that conversation. Rather than prejudice, we deem the same to have resulted in advantage to appellant.

## VI

The decision of the board of review is affirmed.

Chief Judge Quinn concurs.

Ferguson, Judge (dissenting):

I dissent.

With due respect for their conclusion that accused was not prejudiced by trial counsel's cross-examination of the witness Hobbs, I must disagree with my brothers concerning both the recitation of the facts which appear in this record and their legal effect. I am of the opinion that the testimony thus adduced, over proper objection, was inadmissible and harmful. Moreover, the law officer's positive instructions to the court that such could be considered on the issue of credibility were ill-founded and accentuated the evidence's prejudicial effect. As these occurrences alone call for reversal, I need not express my views concerning the other questions before us. I pause, however, expressly to disassociate myself from any notion that counsel may remain silent at the trial when accused by a witness of the most reprehensible misconduct and later fight the matter out on appeal through a purely *ex parte* supplementation of the record. Such, I suggest, summarily abolishes the right of confrontation and hearing at the fact-finding level.

Accused was found guilty of arson, in violation of Uniform Code of Military Justice, Article 126, 10 USC § 926; robbery, in violation of Code, supra, Article 122, 10 USC § 922; and attempted arson, in violation of Code, supra, Article 80, 10 USC § 880. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for nine years. The convening authority set aside the findings of guilty with respect to the offenses of arson and attempted arson on the basis of legal insufficiency of the evidence. He approved the findings of guilty of robbery and so much of the sentence as extended to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for two years. The board of review affirmed. We granted accused's petition for review on a number of assignments of error, but, as noted above, I deem those relating to Hobbs' cross-examination prejudicial and will, therefore, limit my discussion thereto.

After the prosecution had presented its case, consisting largely of testimony by one Cameron, an alleged accomplice of the accused, and the Korean victim of the robbery, defense called Hobbs, another alleged accomplice in all the crimes charged, to refute the claim that accused had in any way participated in the averred offenses of arson and attempted arson.

Hobbs so limited his testimony, but also, in response to defense questioning, declared that the trial counsel had sought to prevent his appearance as a witness for the defense by informing him that his sentence would not be reduced by the convening authority if he testified on behalf of the accused.

During his cross-examination, trial counsel made no mention of Hobbs' testimony that suppression of his evidence had been so attempted. Inexplicably ignoring the opportunity to clear his name, he chose instead—and over vehement objection—to embark upon the following course of questions:

"Q Have you made prior statements regarding your relationship with the accused, Grady, in this case?

"A Yes, I have.

. . . . . .

"Q I think I started to ask you if, on 15 April 1961, at Camp Kaiser, Korea, you answered the following question: 'After you were released from the stockade, did you commit

any additional homosexual acts?' Answer: 'Yes, sir. During the early part of April 1961, I met Recruit Robert J. Grady, Company C, 1st Battle Group. . . . 17th Infantry, whom I also knew in the stockade, in the C Company mess hall. We mutually agreed to commit a homosexual act and then we took each other's penises in our mouths until we reached a climax. On two other occasions we again committed similar acts.' Did you make such a statement?

"A Yes, sir.

. . . . . .

"Q On 15 April 1961, at Camp Kaiser, *did you answer this question*, 'Have you committed any further acts?' in the following manner: 'Yes, sir. On Thursday, 13 April 1961, Grady, Cameron and I again went to the EM Club and began drinking. When the club closed, we all decided to go AWOL. We were dressed in fatigues, and took off for Seoul. We arrived the next morning about 1000 hours and went to the USO, where we got a bed. While we were sleeping, the MP's came during the afternoon and picked us up. We were taken to the MP station and were all put in the same cell. That night Cameron and I committed an act of mutual oral sodomy, and later Grady gave me a blow job. I didn't reciprocate with Grady.' Question: 'Were you detected by the MP's while you were engaged in these acts?' Answer: 'No, sir.' Question: "During these acts, did you kiss each other?' Answer: 'Yes, Sir.' Did you make such a statement?

"A Yes, I did." [Emphasis supplied.]

The accused was not charged with sodomy or any related offense, and the witness Hobbs at no time testified in any way inconsistently with the pre-trial statement with which trial counsel sought to impeach his testimony. Indeed, the question of a homosexual relationship between the witness and the accused formed no part of the direct examination.

From the foregoing, therefore, and

contrary to the impression set forth in the majority opinion, it will be seen that Hobbs *was not asked if he and accused had engaged in an illicit relationship prior to the trial. Rather, the trial counsel's impeachment was carefully limited to whether he had made a statement prior to trial in which he had alleged that sort of a connection.* The rule applicable to this method of impeachment is clearly set forth in the Manual for Courts-Martial, United States, 1951, at page 292:

". . . A witness may be impeached by showing by any competent evidence that he made a statement (or engaged in other conduct) *inconsistent with his testimony*, but a foundation must first be laid before introducing evidence of an inconsistent statement. . . .

. . . . . .

"When a witness refuses to testify as to a certain fact (as when he relies on his right not to incriminate himself), or when a witness *who gives no material testimony properly subject to impeachment testifies that he has no recollection as to such fact, it cannot be shown that at some other time he made a statement as to the fact in question. The reason for this rule is that proof of such a statement either would not impeach the testimony of the witness at all or would improperly impeach his testimony.*" [Emphasis supplied.]

In United States v Kauth, 11 USCMA 261, 29 CMR 77, we were confronted with the necessity of ruling on the question whether the law officer in that case erred in refusing to accept certain stipulated testimony of accused's wife concerning what he had told her prior to the trial. In finding that the law officer acted properly, a unanimous Court, speaking through Judge Latimer, said, at page 267:

". . . That reason is inapposite here *for the original statement is not inconsistent with anything said later by the accused.* Both his in-court testimony and that portion of his pre-trial statement can be accepted as true without there being any conflict." [Emphasis supplied.]

And in United States v Freeman, 4 USCMA 76, 15 CMR 76, we said, at page 82:

"It is axiomatic that the issue of the credibility of a witness is a proper subject for cross-examination, and his credibility may be impeached by *showing that he has previously made statements which are inconsistent with the testimony given by him at trial.*" [Emphasis supplied.]

Reliance need not, however, be placed solely upon our decisions to demonstrate the basic truth that, in order to be permissibly impeaching, prior statements of a witness must contravene his in-court testimony. It is the universal rule, as evidenced by the cases collected in 58 Am Jur, Witnesses, § 767. Indeed, as that authority states, at page 418:

". . . This rule as to showing the inconsistent statements of a witness rests upon the obvious propriety and necessity of informing the jury of circumstances so directly bearing upon the credibility of the witness and the value of his testimony as do contradictory statements by him of the controverted facts concerning which he testifies, and which the jury must determine. The fact that he has stated the facts differently shows either a failure of memory, that he has forgotten what he once knew, or else it shows a want of integrity, and either way it impairs the value of his testimony."

To the same effect, see Delaware, L. & W. R. Co. v Converse, 139 US 469, 35 L ed 213, 11 S Ct 569 (1891); Chicago, St. P., M. & O. Ry. Co. v Kulp, 102 F2d 352 (CA 8th Cir) (1939), cert den, 307 US 636, 83 L ed 1518, 59 S Ct 1032 (1939); and State v Sandros, 186 Wash 438, 58 P2d 362 (1936).

Finally, in Grunewald v United States, 353 US 391, 1 L ed 2d 931, 77 S Ct 963 (1957), the Supreme Court, with rare unanimity, reversed the conviction of one Halperin on the ground that a claim of constitutional privilege before the indicting grand jury was not inconsistent with a claim of innocence before the petit jury. Mr. Justice Harlan, speaking for the Court, noted, at page 418:

"It is, of course, an elementary rule of evidence that prior statements may be used to impeach the credibility of a criminal defendant or an ordinary witness. *But this can be done only if the judge is satisfied that the prior statements are in fact inconsistent.* 3 Wigmore, Evidence, § 1040." [Emphasis supplied.]

It is the intentional violation of this "elementary rule" which the record before us clearly demonstrates. Hobbs' direct examination was carefully limited to the extent of accused's participation in the alleged arson offenses. His pretrial statements relative to a sodomitical relationship with the accused were in no way contradictory of his in-court declarations, nor did they in any manner show that he previously had "stated the facts differently" and was either suffering from "a failure of memory . . . or . . . want of integrity." 58 Am Jur, supra.

Moreover, use of the pretrial statements introduced into the balance of justice a factor against which accused could not prevail. The witness admitted making the pretrial statement. Hence, nothing could be gained by calling as a witness the agent to whom it was made, for he could only corroborate Hobbs' testimony. And to allow accused to adduce proof that he had never engaged in the forbidden sexual connection would result in the trial of a wholly collateral matter which, in the simple interest of judicial expediency, must be forbidden. In short, the entire integrity of the witness—and, more importantly, that of the accused—was destroyed, not by proof of a relationship between the parties, but by proof that the witness, prior to the trial, *had said there was such a relationship.*

Turning to the rationale of the principal opinion, I find nothing in the authorities cited therein which in any manner indicates a basis for departing from the necessity that impeaching statements be inconsistent with the direct testimony of the witness. United States v Grunewald, supra. To the contrary, what Mr. Justice Rutledge

249

wrote for the Court of Appeals in Ewing United States, 135 F2d 633 (CA DC) (1942), fully supports my view.

In that case, accused was tried for rape. Defense witness Chamberlin testified that she and the victim jointly occupied the apartment alleged to have been the scene of the crime. On the night in question, the accused, known to both, left the apartment before they retired and, without the witness' knowledge, could not have re-entered, accomplished a criminal assault, and again departed. On cross-examination, the Government was permitted to ask whether Chamberlin had told the victim's mother prior to the trial that she believed accused was guilty but had to be on his side, as he was facing the electric chair. Upon the witness' denial of these pretrial statements, the Government was further allowed to demonstrate, by calling the mother, that they had been made. The learned Justice concluded that Chamberlin's testimony on direct examination, if believed, exonerated accused. Accordingly, her pretrial assertion that he was guilty was completely contradictory of her in-court statements—"a knife thrust at the whole of her testimony, effective to tear it to shreds, if believed. . . . it lost all character as a mere expression of the witness' opinion, and became an assertion of fact, one effective to contradict almost every crucial specific fact to which she had testified and the ultimate conclusion of fact she intended the jury to draw from them." Ewing v United States, supra, at page 642.

That such was the holding in *Ewing*, supra, is made crystal clear by the same court's most recent decision in the area. In Dixon v United States, 303 F2d 226 (CA DC Cir), decided May 24, 1962, the defendant was on trial for robbery. His wife testified that he remained at home on the date of the robbery until an hour after which he could not have possibly committed it. On cross-examination, she was closely questioned on statements which she allegedly made before the trial, not with respect to her husband's presence at home, but concerning receiving money from him upon his return, his spending of a large sum the next day in Baltimore, and whether he was accompanied on that trip by one Alice Sims. Upon a denial that she had made these statements, the persons to whom they were allegedly directed were called as witnesses and testfied to the contrary.

In reversing *per curiam,* the Court of Appeals said:

"The cross examination of the wife outlined above was not within the scope of her direct testimony. She had said nothing about these matters and the statements attributed to her did not directly challenge the truth of anything she had said in her direct testimony. Nor did these statements relate to her bias or prejudice. We find no basis for their use as a foundation for contradicting her, or any other basis for holding the cross examination proper."

The major portion of my brothers' opinion, however, rests upon their belief that this record can be read—not as indicating the mere impermissible use of prior statements without any showing of inconsistency—but to demonstrate an admittedly illicit sexual bond between Hobbs and Grady which would tend to bias the former in the latter's favor. They base their construction of the record on the fact that, during cross-examination, Government counsel asked whether Hobbs was in "love" with accused and whether he had ever kissed him. Both inquiries were met with denials.

While I have gone to some pains to demonstrate that I cannot join my brothers in their attempt so to gloss over the major thrust of the prosecutor's attack on Hobbs, even were I to assume that the transcript might be so read, I cannot believe that the right to attack the credibility of a witness through a demonstration of an illicit relationship between the parties is sufficiently broad to encompass an accusation against the defendant of participation in disgusting and filthy sexual crimes. So to extend the rules of evidence is completely to distract a court's attention from the weakness of the prosecution's case and to invite con-

viction, not because of the offenses charged, but on account of accused's alleged perversion.

In United States v Long, 2 USCMA 60, 6 CMR 60, we early branded as improper a defense attempt to impeach a prosecution witness in a similar manner. There, we said, at page 70:

". . . Every departure from the norm of human behavior may not be shown on the pretext that it affects credibility."

In United States v Gandy, 5 USCMA 761, 19 CMR 57, the trial counsel sought to discredit accused as a witness by use of a prior inconsistent statement to the effect that he had loaned an accomplice money with which to purchase marihuana because he feared exposure as a homosexual. While Judges Brosman and Latimer upheld accused's conviction, for a variety of reasons, the Chief Judge, in a well-reasoned *dissenting opinion*, declared, at page 771:

". . . The statement he [the prosecutor] sought to attribute to the accused was inadmissible for *all* purposes, for whatever its capacity to impeach may have been, it was designed to show the commission of an offense not charged in direct violation of paragraph 138*q*, Manual for Courts-Martial, United States, 1951; United States v Gibson, 5 USCMA 699, 18 CMR 323. Moreover, the crime suggested by the question was not a run-of-the-mill violation, nor a mere 'undesirable trait of character' as denominated by the majority. The prosecutor very clearly implied that the accused customarily indulged in detestable crimes against nature. *The mere suggestion of such an offense is calculated to inflame the passions of the court, and is likely to overcome the presumption of innocence.*" [Emphasis supplied in part.]

True it is, as my brother Kilday points out, that courts have long permitted a witness' credibility to be diminished by cross-examination concerning his relationship with one of the parties to the trial in order to demonstrate bias or partiality. But when the relationship is not only illicit but involves conduct reprehensible to every normal person, proof of its existence tends so to influence the mind of the average juror that a purely collateral inquiry becomes the motivation for conviction. Thus, where there is a greater risk that such evidence will be taken by the jury to justify accused's conviction as a person of bad moral character than that it will be accepted only as relevant to the issue of the witness' credibility, it should be excluded. And such a distinction has been judicially recognized. Cf. United States v Long, supra; dissenting opinion, Chief Judge Quinn, United States v Gandy, supra; Smith v State, 86 Tex Crim 455, 217 SW 154; Annotation, 27 ALR 278.

That is precisely the situation before us. The Government had a tenuous case against the accused with respect to all the charges. It was dependent almost entirely upon the testimony of an accomplice, for his victim could not even identify accused. Indeed, the staff judge advocate felt compelled to recommend disapproval of the findings of guilty of the arson offenses on the ground of insufficiency of the evidence, and his conclusions were adopted by the convening authority. When the Government, under the guise of impeachment was permitted to paint accused as an active sodomist, guilty of the most revolting behavior, a fair risk clearly appears that the court-martial may have chosen to convict him because of this uncharged criminal conduct rather than because of the testimony concerning his actual crimes.

Because the supposed impeaching evidence so involved accused in Hobbs' misconduct, it should be equally clear that the error which I perceive was not purged by disapproval of the offenses concerning which Hobbs testified. Such a conclusion might be safely reached if Hobbs had been otherwise attacked, but here the damage lies not only in the discredit to him but also in the depiction of the accused as a degenerate. For that reason, I would conclude that the cross-examination, conducted over defense objection, also requires reversal as to the offense of robbery.

In sum, then, I am of the view that,

properly read, the transcript before us necessitates the conclusion that the trial counsel was erroneously and prejudically allowed to blacken accused's character under the guise of using Hobbs' pretrial statement to impeach his testimony, even though it was in nowise inconsistent therewith. Even were I to assume, however, that he directly sought to show Hobbs was biased on account of a homosexual connection with accused, I would yet hold evidence of that relationship inadmissible as, on the whole, it tended more to influence the court against the defendant than to discredit the witness. I cannot, therefore, join with my brothers in a rationale and affirmance which permits an individual to be convicted of robbery because he is allegedly a sexual deviate. See United States v Provoo, 215 F 2d 531 (CA 2d Cir) (1954).

I would reverse the decision of the board of review and authorize a rehearing.