UNITED STATES, Appellee

v

CHARLES B. HOWARD, Sergeant, U. S. Army, Appellant

No. 28,010

July 26, 1974

*Captain Robert C. Mueller* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Lieutenant Colonel Edward S. Adamkewicz, Jr.,* and *Captain J. Houston Gordon.*

*Captain David A. Schlueter* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen,* and *Captain Richard A. Karre.*

## OPINION OF THE COURT

FERGUSON, Senior Judge:

Tried by general court-martial convened at Fort Bragg, North Carolina, the accused was convicted of three specifications of sale and possession of heroin, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934, and one specification of attempted sale of heroin, in violation of Article 80, UCMJ, 10 USC § 880. He was sentenced to a dishonorable discharge, partial forfeitures, confinement at hard labor for 10 years, and reduction to the lowest enlisted grade. The convening authority approved the sentence, but reduced the term of imprisonment to 5 years. The United States Court of Military Review ordered a new review and action on the record, and, on this occasion, the convening authority disapproved the findings of guilty of attempted sale and reduced the term of confinement to 4 years. Otherwise, he approved the sentence. The Court of Military Review affirmed, and we granted review on the following issues:

I. Whether appellant's substantial rights were prejudiced by the admission into evidence, for purposes of impeachment, of a prior inconsistent statement made by Private First Class Hawkins absent the laying of a proper foundation for the admission of such a statement.

II. Whether appellant's substantial rights were prejudiced by the admission into evidence of Staff Sergeant Lemberger's testimony that Private First Class Hawkins had, previous to the alleged offenses, sold heroin for the appellant.

III. Whether appellant's substantial rights were prejudiced by the trial judge's instructions to the court members concerning the import they could attach to evidence of uncharged misconduct as it related to the defense of entrapment.

IV. Whether the convening authority was disqualified from taking action in appellant's case because of his predetermined and fixed ideas as to sentence in cases dealing with drugs.

I

In order to place the issues in proper perspective, a brief discussion of the facts is necessary.

On September 30, 1971, Sergeant Kinston, an undercover Criminal Investigations Detachment agent, visited the "C" Company barracks area. There, he met Private First Class Hawkins and asked where he could buy some heroin. Hawkins took Kinston to the second floor of one of the barracks and introduced him to the accused in the barracks latrine. Accused sold Kinston a packet of heroin for $20.

On October 29, 1971, Kinston attempted unsuccessfully to contact accused. On October 30, he met him at his unit and purchased two packets of heroin. On November 1, accused passed ten packets of heroin to Kinston and was placed under apprehension.

Appearing for the defense, PFC Hawkins testified that Kinston merely asked directions to the barracks and at first mentioned nothing about narcotics. However, when they had reached the third floor, he asked where he could obtain drugs and Hawkins replied that he did not know. On the third floor, Kinston stopped to talk with the accused, but Hawkins continued to walk down the hall. Several minutes later, he saw Kin-

ston and the accused in the latrine. Accused handed Kinston a small packet and Kinston tried to hand him some money. However, the accused refused to take the money, saying he did not want it and that the packet had been given to him.

Hawkins also testified that "around Thanksgiving of this past year" he was called to the CID station by Agent Kinston, who asked him what he saw that night ". . . did I see Sergeant Howard take any money and I said that I didn't and he said that I had to because I was there. Like he started telling me that if I didn't see Sergeant Howard take the money then they would put me in the stockade."

On cross-examination, Hawkins denied associating with the accused or ever receiving any heroin from him. He reiterated that Agent Kinston had questioned him about observing events in the latrine and threatened to confine him. He reported this threat to his commanding officer, Captain Black.

Accused, testifying in his own behalf, conceded that he had given Kinston the heroin on September 30, but only because Kinston feigned withdrawal symptoms and he felt sorry for him. The heroin had been given to him and he refused to accept payment for it. As to the second transaction, Kinston approached him while he was sitting in a car with an unidentified civilian. When Kinston asked for heroin, accused replied that he had none and the civilian then sold Kinston two packets for $40. During the entire period, Kinston had been calling him at work and home attempting to obtain drugs. The accused denied that he ever dealt in narcotics.

In rebuttal, Agent Lemberger testified that he was present when Agent Kinston interrogated PFC Hawkins "on or about Thanksgiving." Hawkins stated that he sold heroin for the accused, had introduced Kinston to the accused, and had observed the "deal go down." Lemberger understood this phrase to mean, in narcotics jargon, that Hawkins saw the heroin and payment exchanged.

## II

Accused contends that he was preju-diced by Lemberger's testimony in two particulars. First, Lemberger was allowed to testify to a prior inconsistent statement by Hawkins without a proper foundation being laid. Second, Lemberger was allowed to testify that Hawkins had admitted previously selling heroin for the accused.

As to the first contention, appellate counsel argue that, as a prerequisite to introducing a witness' prior inconsistent statement, it is necessary to direct the witness' attention to the time and place of the statement, and the identity of the person to whom he made it, and then to ask the witness if he made it. See Manual for Courts-Martial, United States, 1969 (Rev), paragraph 153 *b*(2)(c); United States v Freeman, 4 USCMA 76, 15 CMR 76 (1954). This statement of the relevant law is correct, but it does not follow that, in this case, there was no compliance with it.

Here, trial defense counsel first directed Hawkins' attention to the time and place of his statement to Agent Kinston and elicited from Hawkins his testimony as to the contents of that statement, *i.e.,* that he did not see money exchanged between Kinston and the accused. The same testimony was reiterated on cross-examination, and it is obvious that it would have been fruitless for the trial counsel to pursue the matter further by insisting to the witness that he had told Kinston something different. Hawkins' attention had been drawn to the time and place of his pretrial statement, the identity of his interrogator, and stated his version of the statement he made. Such was sufficient to alert him to the possible rebuttal and constituted a sufficient foundation for Lemberger's testimony to the inconsistent statement allegedly made to Kinston. The assignment lacks merit.

The second issue, regarding the admissibility of evidence of Hawkins' pretrial admission that he had sold heroin for the accused in the past, is likewise without merit. Hawkins testified favorably to the accused as a witness for the defense. Having done so, it was permissible for the prosecution to show a relationship between Hawkins and the accused that would tend to establish bias

on Hawkins' part in favor of the accused. MCM, paragraph 153*b*(2)(d); United States v Grady, 13 USCMA 242, 32 CMR 242 (1962). Such a motive to misrepresent may be shown "either by cross-examination of the witness himself or by evidence otherwise adduced." MCM, paragraph 153*b*(2)(d).

The fact that Hawkins had admitted he was involved with the accused in selling heroin furnished an obvious motive for him to falsify his testimony in favor of the accused. Their relationship was, therefore, properly adduced in rebuttal by the trial counsel, and we see no error in this regard.

## III

The defense also contends that the military judge erred in advising the court as to the effect of evidence of uncharged misconduct. The instruction follows:

Now you have heard some rebuttal testimony on whether the witness, Hawkins, was, in fact, threatened at the CID office. You are not to consider this rebuttal testimony as truth of the matter stated, however it may be used in determining the weight to be given the witness, Hawkins', testimony and thereby affecting his credibility.

Now in this case there has been evidence of several additional uncharged acts of misconduct on the part of the accused, to include the sniffing of heroin in Vietnam, possible sale of 97% pure heroin by the accused or sales by Hawkins for the accused and the fact that there may have been a sale to two other individuals in the latrine on the 30th of September. Now this information was allowed for the very limited purpose of showing knowledge on the part of the accused that it was, in fact, heroin and to show the accused's consciousness of guilt to rebut the contention of the accused that his participation in the offense alleged was as a result of entrapment. I wish to emphasize that such evidence may be considered for no other purpose whatsoever; you may not infer from such evidence that the accused has an evil disposition or criminal propensities and that he, therefore, did the offenses alleged.

At the trial, the accused contended he was entrapped into selling Agent Kinston heroin because Kinston pretended to be an addict. Having raised that defense, it was permissible for the Government to demonstrate that the accused was predisposed to commit the offense and was not a totally innocent person when approached by Kinston. United States v Rock, 9 USCMA 503, 26 CMR 283 (1958). This necessarily involves prior misconduct by the accused that was not charged against him. As such, it was incumbent on the military judge to limit the effect of evidence of that misconduct by appropriate instructions. United States v Baldwin, 17 USCMA 72, 37 CMR 336 (1967). In this case, that is precisely what the military judge did. While his instructions may not be a model of clarity, they conveyed to the court the concept of considering the accused's consciousness of his own guilt while dealing with Kinston *vis a vis* his claim of innocent entrapment. The instructions were proper, and the assignment lacks merit.

## IV

In his fourth assignment of error, the accused contends that the convening authority was disqualified to act on the second review of his case. We agree.

Between the first action on the case and the Court of Military Review's order that a new review be conducted for reasons not now relevant, Major General Kroesen became the convening authority. In November 1972, he published the following letter in "IMPACT," a divisional publication.

Since assuming command of the Division I have been required to render final approval of numerous court-martial findings and sentences. In many cases in which men have been found guilty of dealing in hard drugs, I am also faced with a personal appeal by the individual and his lawyer. The convicted trooper normally tells me that he has had a good record, that he hasn't been in trouble before, that he never realized that he was doing wrong until he was put in stockade and had time to think about it, that now he will never deal in drugs again,

that he wants to return to duty where he will be an outstanding airborne trooper, and that therefore I should suspend the sentence of the court.

Because all convicted drug dealers say the same things, about not realizing the seriousness of their offenses before they are caught, and about not having time to think about it being wrong, I hope all drug traffickers will take note now of my answer to these requests. I believe that drug peddling and drug use are the most insidious form of criminal attack on troopers of this Division that faces us today. If I were an enemy, I could think of no better way to debilitate the combat effectiveness of the 82d than to fill its ranks with drug users, not only because the users become ineffective, but because they destroy a trooper's trust and confidence in the ability of his unit to function in a combat crisis. How many of you want to go to combat under a company commander who is a heroin addict or is hallucinating at the time? So my answer to these appeals is, 'No, you are going to the Disciplinary Barracks at Fort Leavenworth for the full term of your sentence and your punitive discharge will stand.' Drug peddlers, is that clear?

In January 1973, apparently as the result of legal advice, he published another letter in "IMPACT," in an attempt to ameliorate the effect of his initial letter. That letter states:

My statement in the November issue of IMPACT has prompted many questions concerning my referral of cases to a court, my review of courts-martial records and my approval or disapproval of applications for discharge from the service in lieu of courts-martial. Answers to these questions have to be generalized, because each case is different, each is considered independently, and every trooper's record is individually unique.

First, let me establish that I have dual responsibility. I am charged to assure that the case presented was conducted legally and fairly, that the rights of the accused were protected, and that any sentence adjudged is appropriate and consistent. Those last terms, appropriate and consistent, are important to the other elements of my dual responsibility also, that of assuring that the rights and interests of the Army are protected.

Keeping this dual responsibility in mind, then, I consider the potential value of a soldier to the Army, whether or not his rehabilitation is practical, whether or not his commanders and the circumstances of the case justify leniency. Finally, I consider the impact of any action on the future of the trooper himself.

Since joining the division I have had three men, discharged at their own request in lieu of court—martial, who have sought my help in changing the action they had freely chosen, each claiming that he didn't realize what a problem he was creating for himself, wishing that he had stayed in service and accepted his punishment. I try to prevent men from making these mistakes.

In summary, I try to judge what is best for the Army, for the individual trooper, and for the country as a whole. Normally I support the judgment of the court and agree that a man should serve the punishment imposed. Normally I support commanders who recommend discharges for the good of the service. But also, I sometimes suspend punitive discharges or sentences of confinement or forfeiture of pay, and sometimes I disapprove requested discharges because I believe the Army and the individual troop will benefit in the long run.

Thereafter, the accused's case was reviewed and General Kroesen acted on the record.

■ As the defense points out, the initial letter sets forth in unmistakable terms the convening authority's determination to approve sentences in drug cases as adjudged by the courts-martial involved. As he said, his answer to all appeals for clemency was: " 'No, you are going to the Disciplinary Barracks at Fort Leavenworth for the full term of your sentence and your punitive discharge will stand.' Drug peddlers, is that clear?"

Long ago, this Court stated that an accused is entitled as a matter of right to a careful and individualized review of his sentence at the convening authority level. It is the accused's first and perhaps best opportunity to have his punishment ameliorated and to obtain the probationary suspension of his punitive discharge. United States v Scott, 6 USCMA 650, 20 CMR 366 (1956); United States v Laurie, 6 USCMA 478, 20 CMR 194 (1955); United States v Wise, 6 USCMA 472, 20 CMR 188 (1955).

The policy set forth in General Kroesen's first letter clearly denies the accused that opportunity for it states, regardless of the accused's prior record and genuineness of his repentance, his sentence would be approved as adjudged. In short, all drug peddlers would be treated as a class apart and denied their right to individualized reviews.

But the Government argues that, prior to the review of the accused's case, General Kroesen's policy was changed and that, as evidenced by his second letter, each individual received proper consideration on the review of his case. With this, we cannot agree. Cf. United States v Kitchens, 12 USCMA 589, 31 CMR 175 (1961).

Concededly, in the second letter, the convening authority states that he attempts "to judge what is best for the Army, for the individual trooper, and for the country as a whole." But nowhere does the letter retreat from his original position as to the fate of drug peddlers or indicate that he will give their cases individual consideration. Rather, it states he normally supports "the judgment of the court and agree that a man should serve the punishment imposed." Only "sometimes" does he ameliorate that punishment and again no reference is made to the class of offenders whom he so stringently condemned in the earlier communication.

Under the circumstances, we hardly believe that the second letter establishes the accused received the impartial and individualized review to which he is entitled. The second communication does not set aside the General's earlier policy declaration nor does it withdraw his determined stand in drug cases. In these circumstances, the accused is entitled to a new post-trial review before a different convening authority.

The decision of the U. S. Army Court of Military Review is reversed, and the action of the convening authority is set aside. A new review and action on the record is ordered before a different convening authority.

Judge QUINN concurs.